[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 191.]

THE STATE OF OHIO, APPELLANT, *v*. HILL, APPELLEE.

[Cite as *State v. Hill*, 2001-Ohio-141.]

*Criminal law—Use of anonymous juries—Appellate review—When court of appeals engages in a plain-error analysis, it must conduct a complete review of all assignments of error in order to determine whether a manifest miscarriage of justice has occurred that clearly affected the outcome of the trial.*

(No. 00-591—Submitted January 30, 2001—Decided July 5, 2001.)

APPEAL from the Court of Appeals for Fairfield County, No. 98CA67.

————————————

SYLLABUS OF THE COURT

When a court of appeals engages in a plain-error analysis, it must conduct a complete review of all relevant assignments of error in order to determine whether a manifest miscarriage of justice has occurred that clearly affected the outcome of the trial.

————————————

ALICE ROBIE RESNICK, J.

I

Facts and Procedural History

{¶ 1} On September 15, 1997, Harry Sisco was shot and killed in front of his home on South Broad Street in Lancaster, Ohio. Defendant-appellee, Clifton Hill, the stepson of Harry Sisco, was indicted on September 25, 1997, on one count of aggravated murder with two firearms specifications, one count of grand theft of a motor vehicle, one count of fleeing and eluding, and one count of having weapons while under disability with a firearm specification. Appellee pled not guilty to the

charges, and a lengthy jury trial, in which thirty-five witnesses testified, commenced on September 1, 1998.

{¶ 2} Testimony at trial established that appellee and Harry Sisco had been involved in an argument at approximately 5:00 p.m. on September 15, 1997, and that appellee had made threats against Harry Sisco. Several witnesses testified that the argument had left Harry Sisco shaken and frightened.

{¶ 3} After the argument, appellee went to a bar, where the bartender heard appellee talking to his mother on the telephone and making threats against Harry Sisco. While appellee was at the bar, he showed an acquaintance a rifle shell and asked the acquaintance if he thought it would be effective to "take him out." On cross-examination, the witness stated that he thought the "him" referred to in the question was Richard Sisco, Harry Sisco's cousin. (Richard Sisco and appellee had recently had some disagreements, and those disagreements had apparently sparked the argument between Harry Sisco and appellee earlier in the day.)

{¶ 4} From the bar, appellee spoke to his girlfriend, B.J. Avery, on the telephone and asked her to come to the bar and to bring her car. Avery drove her black Ford Probe to the bar and gave appellee her car keys. At about 5:30 p.m., appellee drove to the home of Terry Chandler and borrowed a box of ammunition and a .243 Remington bolt-action rifle with a scope.

{¶ 5} Shortly before the murder, several people saw a small black car (identified by at least one witness as a Ford Probe) drive by Harry Sisco's home. One of those people, Harry Sisco's next-door neighbor Betty Lehman, saw and spoke to Harry Sisco at about 6:35 or 6:40. Lehman observed that Harry Sisco was upset and looked pale. When Lehman told Harry Sisco that he didn't look good and asked him what was wrong, Harry Sisco mentioned the fight he had had with appellee that afternoon and that appellee had threatened him. Harry Sisco also told her that he was afraid of appellee. Lehman, who had known Harry Sisco for fifteen

years, thought that was odd because she had found him to be a person who was not afraid of anybody.

**{¶ 6}** While Lehman was speaking to Harry Sisco, he pointed out a small black car driving by on the street and told her that appellee was inside. Lehman observed that Harry Sisco was "scared to death" at this point. She told him that she didn't want to get in the middle of anything, and urged him to call 911. Lehman then returned to her own home, got in her car, and started to back out of her garage to run an errand.

**{¶ 7}** After she had backed out of her garage, Lehman heard a loud blast but was not sure what it was. She continued onto the street and stopped at a red light nearby. Then she saw people, including one person who was acting "frantically," in the front yard of Harry Sisco's house. Lehman parked her car, ran across the street, and came up to the front porch. When she got there, she saw Harry Sisco lying face down in a shrub. Lehman ran to her house and called 911 at 6:47 p.m.

**{¶ 8}** Two witnesses who were sitting on a nearby front porch that evening both saw a man in a dark car (identified by one as a black Ford Probe) move from the driver's side of the car to the passenger's side. Both witnesses then heard a loud bang. One of the witnesses testified that she saw the occupant of the vehicle move back to the driver's seat and drive away. She was not certain who the man in the car was, but she remarked to the other person, "Did that look like Cliff, Harry's son, to you?" The other witness testified that after the bang, a woman was running and shouting for someone to call 911 and that Harry Sisco had been shot.

**{¶ 9}** Terry Chandler retrieved the rifle from appellee later that evening. As appellee handed Chandler the gun from the window of the car he was driving, Chandler saw shells scattered on the seat of appellee's car. Appellee also handed the shells to Chandler. Appellee told Chandler not to tell anyone that he had seen appellee at this time, and appellee drove away.

{¶ 10} Chandler feared that Harry Sisco had been killed with his gun. He did not report his encounter with appellee to the police. When the police later questioned him, Chandler initially lied and told them he had thrown the gun into the Ohio River. Chandler turned the gun over to police nearly six months after the murder.

{¶ 11} On the evening of September 15, appellee asked to borrow an acquaintance's motorcycle. When permission was refused, appellee took the motorcycle anyway and rode off. Appellee subsequently led police on a high-speed chase and was eventually apprehended.

{¶ 12} When police searched Avery's car, they found two rounds of .243 ammunition. A firearms expert for the state testified that at one time the rounds had been chambered in Chandler's rifle.

{¶ 13} At trial some stipulations were presented to the jury. One stipulation was that appellee's blood was drawn at 1:40 a.m. on September 16, 1997, and that this sample revealed a blood-alcohol level of "0.14 grams percent by weight." Other stipulations included the following: (1) no gunpowder particles were found on appellee's glasses, hat, watch, or clothing; (2) no fingerprints were obtained from the ammunition rounds found in Avery's car; (3) only one usable fingerprint was lifted from the car, and it was not appellee's; (4) no usable fingerprints were lifted from the rifle; (5) no usable fingerprints were lifted from the motorcycle; (6) no gunshot residue was discovered in the car; and (7) no gunshot residue was discovered on appellee, Harry Sisco, or Richard Sisco.

{¶ 14} After the state rested, appellee did not call any witnesses, and appellee did not take the stand to testify to the jury. After deliberations, the jury found appellee guilty of aggravated murder and of both specifications accompanying that count, not guilty of grand theft of a motor vehicle, but guilty of the lesser included offense of unauthorized use of a motor vehicle, guilty of fleeing

and eluding, and guilty of having weapons while under disability and the firearm specification on that count.

{¶ 15} After appellee was sentenced, he appealed to the Court of Appeals for Fairfield County, raising six assignments of error. The court of appeals reversed the convictions, upholding two of appellee's assignments of error and finding the remaining four moot. As one ground for its decision, the court of appeals found that reversal was warranted because the trial court committed "structural error" in seating an anonymous jury for appellee's trial, even though appellee had not objected to the use of an anonymous jury.

{¶ 16} As another basis for its decision, the court of appeals determined that appellee was penalized at trial for invoking his right to remain silent. The court of appeals found that a police detective improperly testified at trial regarding appellee's invocation of the right and that the state improperly commented on appellee's invocation of the right in closing argument. The court of appeals found that appellee did not object to the testimony, but determined that reversal was warranted because plain error occurred.

{¶ 17} The cause is now before this court pursuant to the allowance of a discretionary appeal.

## II

### Anonymous Jury Issue

{¶ 18} The first issue we address is whether the utilization of an anonymous jury at appellee's trial constituted reversible error.

### A

{¶ 19} The jury trial in this case was conducted in accordance with Loc.R. 1.14 of the Court of Common Pleas of Fairfield County. That rule, effective May 2, 1996, provides:

"*GRAND JURY AND PETIT JURY LISTS*—The names and addresses of grand jurors and petit jurors will remain anonymous, except upon court order after

a hearing and for good cause shown. The Clerk of Courts, the Jury Commission, Jury Manager, Fairfield County Sherriff [*sic*], and the Court shall have access to the names and addresses for administrative purposes. The Prosecutor may have access to the names of the grand jurors on an as needed basis."

{¶ 20} The introductory paragraph that accompanied the rule at the time it was promulgated provided:

"In order to maintain secrecy of the grand jury proceedings and the privacy of petit jurors, to alleviate the concern of the jurors for fear of intimidation and/or harassment, to encourage jurors' willingness to participate as jurors, and to fulfill the Court's promise of confidentiality, it is hereby ordered that Local Rule of Court 1.14, Jury Questionnaires, is hereby repealed and the Court establishes a new Local Rule of Court 1.14 for the Common Pleas Court, General Division."

{¶ 21} Both parties seemed to have acquiesced in the use of an anonymous jury without raising any questions at trial about the practice. Appellee's attorney did not object to an anonymous jury, and there is no indication in the record that the attorney sought to obtain the names or addresses of the jurors. The state also did not object to the anonymous jury, and there is no indication in the record that the state sought to receive the names or addresses of the jurors. An extensive jury voir dire was conducted by both parties. Throughout the voir dire and the trial, jurors were identified by number rather than by name.

{¶ 22} At the commencement of voir dire, the trial court made the following statement to the prospective jurors:

"Ladies and gentlemen, as you've noticed, we have over 40 of you here today. And we will be selecting 14 jurors, 12 jurors and two alternates. Also notice that you are given a number. We used to have names and addresses and phone numbers on our list of jurors that came in. And a year or so ago, the Court decided—the Judges decided that a number of jurors asked to remain anonymous. So we have slowly taken away addresses and phone numbers and now names, and

so you have a number. It's not that we want to relate to you impersonally, it's for your anonymity, your privacy, so that people may not call you in any way. And that way—but if anybody—we'll talk about that later. But that's the reason for it. And counsel may refer to you as your number. They may refer to you as sir or ma'am or something like that. Certainly, they would rather be more personal, but with numbers, sometimes it appears to be more impersonal. But that's the reason for that."

**{¶ 23}** Appellee argues that the use of an anonymous jury violated his rights to the presumption of innocence, to a trial by jury, to a public trial, and to a trial by a fair and impartial jury. See Section 2, Article III, United States Constitution ("Trial of all Crimes * * * shall be by Jury"); Sixth Amendment to the United States Constitution ("accused shall enjoy the right to a speedy and public trial"); Section 5, Article I, Ohio Constitution ("right of trial by jury shall be inviolate"); Section 10, Article I, Ohio Constitution ("party accused shall be allowed * * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed").

**{¶ 24}** Because appellee did not object to the use of an anonymous jury, or raise any issue regarding juror anonymity at trial, our precedents require us to ask whether plain error occurred in this situation. Normally, an appellate court need not consider an error that was not called to the attention of the trial court at a time when the error could have been avoided or corrected by the trial court. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. Accordingly, a claim of error in such a situation is usually deemed to be waived absent plain error. See Crim.R. 52(B). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

B

**{¶ 25}** The court of appeals found that it was not limited to applying a plain-error analysis to the anonymous jury situation at issue in this case. Instead, the court of appeals determined that this was a situation to be reviewed under the doctrine of "structural error."

**{¶ 26}** In *Neder v. United States* (1999), 527 U.S. 1, 7-9, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35, 45-47, the United States Supreme Court recently summarized the essentials of its jurisprudence regarding structural error:

"Rule 52(a) of the Federal Rules of Criminal Procedure, which governs direct appeals from judgments of conviction in the federal system, provides that '[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.' Although this Rule by its terms applies to *all* errors where a proper objection is made at trial, we have recognized a limited class of fundamental constitutional errors that 'defy analysis by "harmless error" standards.' *Arizona v. Fulminante*, 499 U.S. 279, 309 [111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331] (1991); see *Chapman v. California*, 386 U.S. [18] 23 [87 S.Ct. 824, 827-828, 17 L.Ed.2d 705, 710] (1967). Errors of this type are so intrinsically harmful as to require automatic reversal (*i.e.,* 'affect substantial rights') without regard to their effect on the outcome. For all other constitutional errors, reviewing courts must apply Rule 52(a)'s harmless-error analysis and must 'disregar[d]' errors that are harmless 'beyond a reasonable doubt.' *Id.,* at 24 [87 S.Ct. at 828, 17 L.Ed.2d at 711].

" * * *

"We have recognized that 'most constitutional errors can be harmless.' *Fulminante, supra*, at 306 [111 S.Ct. at 1263, 113 L.Ed.2d at 329]. '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutiona[l] errors that may have occurred are subject to harmless-error analysis.' *Rose v. Clark*, 478 U.S. 570, 579 [106 S.Ct. 3101, 3106, 92 L.Ed.2d 460, 471] (1986). Indeed, we have found an error to be

'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' *Johnson v. United States*, 520 U.S. 461, 468 [117 S.Ct. 1544, 1549, 137 L.Ed.2d 718, 728] (1997) citing *Gideon v. Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799] (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749] (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254 [106 S.Ct. 617, 88 L.Ed.2d 598] (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168 [104 S.Ct. 944, 79 L.Ed.2d 122] (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39 [104 S.Ct. 2210, 81 L.Ed.2d 31] (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182] (1993) (defective reasonable-doubt instruction).

" * * *

"Those cases, we have explained, contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' *Fulminante, supra*, at 310 [111 S.Ct. at 1265, 113 L.Ed.2d at 331]. Such errors 'infect the entire trial process,' *Brecht v. Abrahamson*, 507 U.S. 619, 630 [113 S.Ct. 1710, 1717, 123 L.Ed.2d 353, 367] (1993), and 'necessarily render a trial fundamentally unfair,' *Rose*, 478 U.S. at 577 [106 S.Ct. at 3106, 92 L.Ed.2d at 470]. Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence * * * and no criminal punishment may be regarded as fundamentally fair.' *Id.*, at 577-578 [106 S.Ct. at 3106, 92 L.Ed.2d at 470]." (Emphasis *sic*.) See, also, *State v. Esparza* (1996), 74 Ohio St.3d 660, 661, 660 N.E.2d 1194, 1196 (noting that "structural error" is distinguishable from "trial error," and is not subject to harmless-error analysis).

{¶ 27} In arguing that the use of an anonymous jury was structural error, appellee and supporting *amici curiae* point out the importance of jury trials to our system of justice, as reflected in the Ohio and United States Constitutions, and in

numerous court decisions. Appellee urges that the use of an anonymous jury compromised appellee's right to a jury trial to such a degree that the right was effectively destroyed.

**{¶ 28}** Appellee and supporting *amici curiae* further endorse the court of appeals' finding of structural error by citing federal cases that considered whether prejudicial error was present when anonymous juries were used. See, *e.g.*, *United States v. Talley* (C.A.6, 1999), 164 F.3d 989. The *Talley* court articulated that a trial court "should not order the empaneling of an anonymous jury without '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.' " *Id.* at 1001, quoting *United States v. Paccione* (C.A.2, 1991), 949 F.2d 1183, 1192. See, also, *United States v. Krout* (C.A.5, 1995), 66 F.3d 1420, 1427 ("Factors that may justify jury protection by anonymity include: [1] the defendants' involvement in organized crime; [2] the defendants' participation in a group with the capacity to harm jurors; [3] the defendants' past attempts to interfere with the judicial process or witnesses; [4] the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and [5], extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment"); *United States v. Sanchez* (C.A.5, 1996), 74 F.3d 562 (same).

**{¶ 29}** We of course agree with appellee's view that the right to a public jury trial, and the other associated rights appellee mentions, are very important and basic rights. However, we decline to hold that structural error is present in every situation in which those fundamental rights are allegedly limited in any way. We note that appellee's trial was open to the public and that newspaper reporters were present.

**{¶ 30}** Appellee's failure to express any disagreement whatsoever at trial to the use of an anonymous jury is the key factor that distinguishes this case from the federal cases on juror anonymity cited by appellee. In many of those cases, juror anonymity was contested at trial, and the trial courts decided to use anonymous juries after being made aware of the defendants' protestations that fundamental rights were being compromised.

**{¶ 31}** Due to appellee's failure to raise the anonymity issue at trial, we decline to consider the propriety of the anonymous-jury local rule, even though we recognize that the rule implicates important concerns that would clearly be worthy of review by this court if the issue had been properly presented.[1] See *Work v. State* (1853), 2 Ohio St. 296, 303 ("the right of trial by jury * * * justly demands our jealous scrutiny when innovations are attempted to be made upon it").

**{¶ 32}** At its heart, the concept behind structural error is that certain errors are so fundamental that they obviate the necessity for a reviewing court to do a harmless-error analysis. However, it is arguable whether the harmless-error/structural-error distinction discussed in cases such as *Neder* (in which an objection was lodged) should also apply to a plain-error case in which no objection was raised at trial. In *Johnson v. United States*, 520 U.S. at 466, 117 S.Ct. at 1548, 137 L.Ed.2d at 727, a case in which a criminal defendant argued that an unobjected-to error was structural, and therefore outside the plain-error strictures of

---

1. At oral argument, a question arose as to whether Loc.R. 1.14 of the Common Pleas Court of Fairfield County was adopted in accordance with C.P.Sup.R. 5(A)(2), which requires notice and an opportunity for comment to accompany the adoption of a local rule of practice. The record of proceedings below in the trial and appellate courts contains little mention of the local rule and therefore sheds no light on the circumstances surrounding the rule's adoption. This, more than anything, demonstrates that the propriety of an anonymous jury simply was not an issue in the trial of this case. It appears that appellant's memorandum in support of jurisdiction in this court is the first time that the local rule's text was attached to anything filed by either party in the entire course of this litigation.

Fed.R.Crim.P. 52(b),[2] the United States Supreme Court cautioned against "unwarranted expansion" of Fed.R.Crim.P. 52(b), and stated that even claims of serious error did not fall outside the scope of that rule. The *Johnson* court reasoned that expanding Rule 52(b) " 'would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." ' " *Id.*, quoting *United States v. Young* (1985), 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12-13, in turn quoting *United States v. Frady* (1982), 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816, 827. The *Johnson* court further found that it had no authority to create a "structural error exception" to the rule, and seemed to hold that, in direct appeals from federal convictions, a structural error analysis is inappropriate in a plain-error situation. 520 U.S. at 466, 117 S.Ct. at 1548, 137 L.Ed.2d at 727.

{¶ 33} Nevertheless, assuming that a structural-error analysis may possibly apply in an egregious plain-error situation, we find that in the circumstances of this case, the seating of an anonymous jury was not structural error. The use of an anonymous jury does not necessarily involve the violation of a fundamental right. There is no unqualified constitutional right to know the identity of jurors. In the instant case, the seating of an anonymous jury did not necessarily render the trial so fundamentally unfair that it could not be a reliable vehicle for the determination of appellee's guilt or innocence. See *Rose*, 478 U.S. at 577-578, 106 S.Ct. at 3106, 92 L.Ed.2d at 470. We find that this case does not present an example of a violation of a fundamental constitutional right that would lead to the basic unfairness that was present in cases such as *Gideon*, *Tumey*, *Vasquez*, *McKaskle*, *Waller*, or *Sullivan*. We do not believe that the anonymous jury rule impinges on fundamental

---

2. Fed.R.Crim.P. 52(b) is an exact counterpart of Ohio's Crim.R. 52(B). Both rules provide that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

rights in the same way as the deprivation of counsel in *Gideon*, or the biased trial judge in *Tumey*, or the racial discrimination in *Vasquez*. Accordingly, to the extent that the court of appeals held that structural error warrants the reversal of appellee's convictions, we reverse that judgment.

C

{¶ 34} Because this is not a structural-error situation, we must proceed to consider whether plain error occurred in the use of an anonymous jury. A thorough review of the record reveals no hints of any prejudice to appellee flowing from the use of an anonymous jury. The trial court explained to the potential jurors at the outset of voir dire that anonymity was the rule for *all* trials in that court, making clear that anonymity was not being invoked to prevent them from being harmed by this particular defendant. An extensive voir dire of the potential jurors was conducted, and we can find no indications in the record that appellee's attorney's efforts to seat an acceptable jury were impeded in any way by the unavailability of the names and addresses of jurors.

{¶ 35} Indeed, we would be hard-pressed to determine from this record that *any* error occurred in the seating of an anonymous jury, the starting point for a plain-error inquiry. See Crim.R. 52(B). See, also, *United States v. Olano* (1993), 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (first condition to be met in noticing plain error is that there must be error). Since appellee has failed to persuade us that any error occurred in the use of an anonymous jury, we agree with the court of appeals that appellee falls well short of demonstrating "plain error" warranting reversal.

III

Appellee's Statement

{¶ 36} The second major issue we address is whether plain error occurred when the state used at trial appellee's statement made to a police officer that appellee was "not saying anything." This statement was conveyed to the jury by a police officer who testified for the state, and by the state's mention of the statement in closing arguments.

A

{¶ 37} As its final witness, not long before the conclusion of the state's presentation of evidence, the state called Lancaster Police Detective David W. Bailey, who had interviewed appellee on September 15 after he was arrested. Bailey was asked on direct examination about an exchange he and appellee had had after appellee signed a *Miranda* rights waiver and before appellee made a tape-recorded statement. The prosecutor asked, "And during that pre-interview, when you confronted [appellee] about the homicide, the murder of Harry Sisco, what, if anything did he say?" Bailey responded, "I told him that Harry Sisco was the victim of a shooting homicide and he told me that's the first time that he heard it, that that had taken place. I then confronted him with some of the meager information that I had at that point about him being seen in the area, also about the argument prior to the homicide. And his exact words to me at that point were, 'You do what the fuck you have to. I'm not saying anything.' "

{¶ 38} The state then prepared to play appellee's tape-recorded statement to the jury. At this point, in his first challenge to the recording, appellee's attorney objected, arguing that once appellee said that he was "not saying anything," all questioning should have ceased and that therefore the tape recording should be suppressed. The trial court decided to entertain appellee's late challenge to the recording (see Crim.R. 12[G]), excused the jury, and conducted an extensive hearing, which included a voir dire of Bailey and appellee regarding the

14

conversation. After the hearing, the trial court found that the continued questioning of appellee by Bailey had violated *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, and ruled that the questioning of appellee should have ended after appellee stated, "I'm not saying anything." The trial court suppressed the tape-recorded statement.

{¶ 39} Even though the trial court suppressed the tape recording, the trial court specified that its ruling did not include suppressing anything said "prior to the taped statement being made." When the jury reentered the courtroom, the state resumed its direct examination of Bailey and again questioned him about what appellee had said up to and including the point where appellee stated that he was not saying anything. Appellee did not object to these questions, did not request a limiting instruction, and no limiting instruction was given.

{¶ 40} During closing argument, and also during its rebuttal argument, the state again alluded to appellee's statement that he was not saying anything. After rebuttal, out of the presence of the jury, appellee's counsel objected to the state's repetition of appellee's statement in its closing arguments but did so in the context of contending that the state was improperly commenting on appellee's decision not to take the witness stand. The state replied that it had not intended for its repetition of appellee's statement to be an implied comment on appellee's decision not to testify. The trial judge stated that he would give an instruction that appellee did not have to testify, and that "that should clear it up." Appellee's counsel did not respond to the trial court's statement and the discussion was concluded.

B

{¶ 41} As the starting point for our analysis, we first determine that appellee's objection, lodged after closing argument, contending that the state was improperly commenting on his decision not to take the witness stand, cannot be taken as an objection regarding the specific issue we consider, which is whether the

state improperly introduced evidence and commented on appellee's invocation of his right to remain silent. From the context, it is clear that defense counsel was objecting *only* to what he considered to be an implied comment on appellee's failure to take the stand. Therefore, the issue must be reviewed under the standards for plain error (see Crim.R. 52[B]), rather than under the standards for harmless error (see Crim.R. 52[A]).

{¶ 42} In *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, the United States Supreme Court held that the use for impeachment purposes at trial of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In *State v. Rogers* (1987), 32 Ohio St.3d 70, 73, 512 N.E.2d 581, 584, this court noted that "federal courts, in applying the plain or harmless error analysis in cases where there had been *Doyle* violations, with near unanimity, have held such to be violative of due process and therefore prejudicial, requiring a reversal." Of course, there was no use of appellee's silence for impeachment here, as he did not testify, so this case differs from *Doyle* in a key particular.

{¶ 43} In *Wainwright v. Greenfield* (1986), 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623, the United States Supreme Court held that the use of a criminal defendant's silence after receiving *Miranda* warnings to rebut his claim of insanity violates due process. The court reasoned that *Doyle* held that *Miranda* warnings contain an implied assurance, based in the Constitution, that silence would carry no penalty. 474 U.S. at 295, 106 S.Ct. at 637-638, 88 L.Ed.2d at 632. In *Rogers*, the factual scenario was virtually identical to that of *Wainwright v. Greenfield*, in that the state had used the defendant's silence to rebut his claim of insanity. This court in *Rogers* reconsidered its earlier affirmance of the defendant's conviction in light of *Wainwright v. Greenfield*, reversed the defendant's conviction, and ordered a new trial. *Id.* at 74, 512 N.E.2d at 585.

**{¶ 44}** The court of appeals in this case concluded that "it was plain error to permit testimony and argument on [Hill's] invocation of his right to remain silent." In so concluding, the court of appeals reasoned that the error was "tantamount to a *Doyle* violation." The court of appeals appears to have determined that this situation involved such obvious plain error that it saw no need to consider in depth the record developed at trial to determine if a manifest miscarriage of justice occurred. For want of a better term, it seems accurate to label the manner in which the court of appeals resolved this issue as a "plain error *per se*" resolution. Such an approach is inconsistent with the concept of plain error and has no support in our precedents.

**{¶ 45}** We specifically disagree with this reasoning of the court of appeals that some type of plain error *per se* is present in this situation. Neither *Doyle, Wainwright v. Greenfield,* nor *Rogers* mandates a summary finding of plain error in this case that would allow a reviewing court to dispense with the full plain-error inquiry. To the extent that the court of appeals applied a "plain error *per se*" rule to this asserted error, we find its analysis to be flawed. This error should be assessed under the same plain-error standards that are set forth in Part II of this opinion.

C

**{¶ 46}** As part of the inquiry into whether plain error occurred, a reviewing court "must examine the error asserted by the [defendant] in light of all of the evidence properly admitted at trial and determine whether the jury would have convicted the defendant even if the error had not occurred." *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925. Reversal is warranted only if the outcome of the trial clearly would have been different absent the error. See *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. In addition, plain error should be found only in exceptional circumstances and only to prevent a manifest miscarriage of justice. *Id.* at paragraph three of the syllabus.

**{¶ 47}** An assessment of whether plain error occurred in the situation at issue is hampered by the manner in which the court of appeals disposed of other claims of error raised in that court by appellee. The court of appeals found four of appellee's assignments of error to be moot in light of its rulings on the two it chose to address. Given that we disagree with the way the court of appeals ruled on those two assignments of error, several of the issues raised within the unaddressed assignments of error might affect a plain-error inquiry. Consistent with *Slagle*, 65 Ohio St.3d at 605, 605 N.E.2d at 925, this inquiry requires a reviewing court to assess appellee's assertions of error in allowing testimony and comment on his exercise of his right to remain silent "in light of all of the evidence *properly* admitted at trial." (Emphasis added.)

**{¶ 48}** It is virtually impossible to perform this assessment because the finding of mootness by the court of appeals left unresolved the issue of exactly what evidence *properly* was admitted at trial. Only after that issue is decided can a complete inquiry be conducted into whether plain error occurred. Furthermore, given our determination that no plain error requiring summary reversal occurred in admitting appellee's statement that he was not talking, those unaddressed assignments of error must be evaluated in their own right to determine their effect, if any, on the plain-error inquiry discussed above.

**{¶ 49}** It is urged that this court should remand the cause to the court of appeals for further consideration in the event that this court reverses the judgment of the court of appeals on the issues that court found dispositive. We agree that remand is appropriate and necessary for a complete analysis under the plain-error doctrine. Therefore, we remand this cause to the court of appeals to consider the unaddressed assignments of error and to proceed as warranted to an assessment of plain error, in light of the resolution of those assignments of error that are pertinent to that inquiry.

{¶ 50} For the foregoing reasons, we hold that when a court of appeals engages in a plain-error analysis, it must conduct a complete review of all relevant assignments of error in order to determine whether a manifest miscarriage of justice has occurred that clearly affected the outcome of the trial.

{¶ 51} Accordingly, the judgment of the court of appeals is reversed in part, and the cause is remanded to the court of appeals for further proceedings.

*Judgment reversed in part*
*and cause remanded.*

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and COOK, J., concur in judgment.

PFEIFER, J., dissents.

_____

**COOK, J., concurring in judgment.**

{¶ 52} I agree with the majority that the instant case warrants reversal and a remand for further proceedings. I must respectfully disagree, however, with two aspects of the majority's analysis.

I

{¶ 53} The majority concludes in Part II(C) that "[a] thorough review of the record reveals no hints of any prejudice to appellee flowing from the use of an anonymous jury." In that same section, the majority also states with no detailed analysis that "we would be hard-pressed to determine from this record that *any* error occurred in the seating of an anonymous jury." (Emphasis *sic*.) I would rather eliminate the need to analyze both whether error occurred and whether it was prejudicial by deciding that use of the anonymous jury is not plain error on the basis that the alleged error is not *plain*.

{¶ 54} In my recent dissent in *State v. McKee* (2001), 91 Ohio St.3d 292, 299, 744 N.E.2d 737, 743, I noted that the United States Supreme Court has identified four considerations that apply to a plain-error inquiry:

"First and most fundamentally, there must be error, *i.e.*, a deviation from a legal rule. [*United States v. Olano* (1993), 507 U.S. 725, 732-733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508, 518.] Second, the error must be plain. To be plain, the error must be ' "clear" or, equivalently, "obvious." ' *Id*. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519, citing [*United States v. Young* (1985), 470 U.S. 1, 17, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1, 13, fn. 14]. Third, the error must affect substantial rights. In most cases, this means that the error must have affected the outcome of the trial. *Olano*, 507 U.S. at 734, 113 S.Ct. at 1777-1778, 123 L.Ed.2d at 519-520."

**{¶ 55}** If a party satisfies the three foregoing conditions, a reviewing court then has the discretion to correct the plain error. *McKee*, 91 Ohio St.3d at 299-300, 744 N.E.2d at 743-744 (Cook, J., dissenting).

**{¶ 56}** A reviewing court neither has to decide whether a party can satisfy each prong of the plain-error inquiry nor has to answer each prong in order. See *Johnson v. United States* (1997), 520 U.S. 461, 469-470, 117 S.Ct. 1544, 1550, 137 L.Ed.2d 718, 728-729 (declining to resolve whether an error "affec[ted] substantial rights" because the error did not "seriously affec[t] the fairness, integrity or public reputation of judicial proceedings"). Therefore, unlike the majority, I would decide this case on Hill's failure to satisfy the second prong of the plain-error inquiry: the error must be plain. In addressing this prong, "[s]everal federal appellate courts applying the *Olano* analysis have held that an error cannot be deemed plain if there is no controlling case law on point and the authority in other circuits is split. Simply put, if the law is unclear on a particular issue at the time of trial and remains that way at the time of appeal, *the error cannot be plain and should not be noticed under Crim.R. 52(B)*." (Citations omitted; emphasis added.) *McKee*, 91 Ohio St.3d at 300-301, 744 N.E.2d at 744 (Cook, J., dissenting).

**{¶ 57}** Here, it was not clear either at the time of trial or appellate review that use of an anonymous jury violated Hill's constitutional rights. Neither the United States Supreme Court, this court, nor the Fifth District Court of Appeals had

issued controlling case law on point. Therefore, no reviewing court could properly find error through a plain-error analysis. Even assuming *arguendo* that use of the anonymous jury was error, it was not *plainly so* in this instance.

## II

{¶ 58} In addressing the state's solicitation of testimony regarding Hill's statements and the state's comments on Hill's invocation of his right to silence, the majority says that "[f]or want of a better term, it seems accurate to label the manner in which the court of appeals resolved this issue as a 'plain error *per se*' resolution." I agree with this statement only to the extent that it appears that the court of appeals failed to consider the alleged errors within the full context of the trial proceedings. This is analytic error necessitating remand. See *Young*, 470 U.S. at 11-12, 105 S.Ct. at 1044, 84 L.Ed.2d at 10 (inappropriate prosecutorial remarks must be examined within the context of the trial to determine whether plain error exists); *State v. Treesh* (2001), 90 Ohio St.3d 460, 480, 739 N.E.2d 749, 771 (improper testimony that a defendant requested an attorney during police interview can be harmless within the context of the trial).

{¶ 59} The majority, however, goes on to state that a plain error *per se* approach "is inconsistent with the concept of plain error." But the validity of a "plain error *per se*" approach is not well settled and should not be dismissed as an impossibility without fuller analysis. Compare *Young*, 470 U.S. at 16, 105 S.Ct. at 1047, 84 L.Ed.2d at 13, fn. 14 ("A *per se* approach to plain-error review is flawed," because it "could well lead to having appellate courts indulge in the pointless exercise of reviewing 'harmless plain errors' ") with *Olano*, 507 U.S. at 734-735, 113 S.Ct. at 1778, 123 L.Ed.2d at 519-520 (suggesting in dicta that there may be three potential categories of forfeited errors that can be recognized under plain-error analysis, including those forfeited errors that "can be corrected regardless of their effect on the outcome" and those forfeited errors that "should be presumed prejudicial if the defendant cannot make a specific showing of prejudice"). Given

the arguable possibility of such an approach, I decline to adopt or reject outright that plain error *per se* could exist under Crim.R. 52(B) without fuller analysis.

## III

**{¶ 60}** I concur with the majority's view that no structural error occurred in this case. I also agree with the majority's decision to reverse and remand for further consideration of whether those alleged errors related to Hill's invocation of his right to silence constitute plain error, to the extent that the court of appeals should apply *Olano*.

MOYER, C.J., concurs in the foregoing opinion.

———————————

**PFEIFER, J., dissenting.**

**{¶ 61}** In *Work v. State* (1853), 2 Ohio St. 296, 304, this court stated when discussing the right to trial by jury: "An institution that has so long stood the trying tests of time and experience, that has so long been guarded with scrupulous care, and commanded the admiration of so many of the wise and good, justly demands our jealous scrutiny when innovations are attempted to be made upon it." That was one hundred and forty-eight years ago, and until Loc.R. 1.14 of the Fairfield County Common Pleas Court was amended on May 2, 1996, there had been no tradition of anonymous juries in Ohio.

**{¶ 62}** Federal courts have allowed anonymous juries when " 'there is strong reason to believe the jury needs protection' and the district court 'tak[es] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.' " *United States v. Krout* (C.A.5, 1995), 66 F.3d 1420, 1427, quoting *United States v. Wong* (C.A.2, 1994), 40 F.3d 1347, 1376. See, also, *United States v. Talley* (C.A.6, 1999), 164 F.3d 989, 1001. The federal appellate courts have required district courts to justify the use of anonymous juries by considering:

"(1) the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment." *Krout*, 66 F.3d at 1427; *United States v. Sanchez* (C.A.5, 1996), 74 F.3d 562, 564.

{¶ 63} The use of anonymous juries in our state may in certain circumstances be appropriate after full consideration of these factors. However, nothing in the state's brief or oral argument in this case convinces me that anonymous juries ought to be routine. To the contrary, as Justice Ranney noted so long ago, innovations such as anonymous juries should be carefully scrutinized. *Work*, 2 Ohio St. at 304.

{¶ 64} As a practical matter, reviewing the names and addresses of jurors can provide invaluable information to counsel. Such information can help counsel determine whether the relative of a juror has recently been involved in a criminal matter either as a defendant or a victim and whether any jurors live in high- or low-crime areas. It is also possible that a juror's name will sound an alarm that the juror should be questioned further. See Abramovsky & Edelstein, Anonymous Juries: In Exigent Circumstances Only (1999), 13 St. John's J. Legal Comment. 457, 476-479 (use of anonymous juries impairs ability to make intelligent use of peremptory challenges to uncover hidden bias or interest).

{¶ 65} The court of appeals stated, and I agree, that "[t]he anonymous jury system is a significant alteration in the way jury trials have been conducted in this state. Although [this information is] not contained in the record, one can theorize [that] this carte blanche anonymous jury system is a result of the trial court's concern for accommodating jurors who may be hesitant or timid about jury service.

Although the concern exhibited by the trial court is laudable in some respects, it nonetheless flies in the face of history, precedent, custom and the federal cases."

{¶ 66} Anonymous juries significantly diminish the right to a trial by jury by preventing access to information necessary for voir dire. Allowing anonymous juries is structural error because anonymous juries affect " 'the entire conduct of the trial from beginning to end' " and " 'the framework within which the trial proceeds.' " *State v. Esparza* (1996), 74 Ohio St.3d 660, 661, 660 N.E.2d 1194, 1196, quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331.

{¶ 67} Accordingly, I dissent and would grant a new trial.

_____

*David L. Landefeld,* Fairfield County Prosecuting Attorney, and *Gregg Marx*, Assistant Prosecuting Attorney, for appellant.

*Carol A. Wright; Vorys, Sater, Seymour & Pease LLP, James E. Phillips* and *Timothy W. Hoover*, for appellee.

*Dan Gattermeyer*, Butler County Prosecuting Attorney, and *Daniel G. Eichel*, Assistant Prosecuting Attorney, urging reversal for *amicus curiae* Ohio Prosecuting Attorneys Association.

*Kohrman Jackson & Krantz P.L.L.* and *James B. Rosenthal; Raymond Vasvari*, urging affirmance for *amicus curiae* American Civil Liberties Union of Ohio Foundation, Inc.

*Baker & Hostetler LLP, David L. Marburger* and *Gina A. Brickley*, urging affirmance for *amicus curiae* Ohio Coalition for Open Government.

*Lucy Dalglish, Gregg Leslie* and *Ashley Gauthier; Cohn & Marks, Richard Schmidt* and *Kevin M. Goldberg*; *Baker & Hostetler LLP, Bruce W. Sanford, Robert D. Lystad* and *Bruce D. Brown*, urging affirmance for *amici curiae* Reporters Committee for Freedom of the Press, American Society of Newspaper Editors, and the Society of Professional Journalists.

January Term, 2001