OPINION
{¶ 1} Defendant-appellant, Ronald L. Harshaw, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of menacing by stalking in violation of R.C. 2903.211. Defendant assigns a single error:
THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF MENACING BY STALKING AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Because the sufficiency and weight of the evidence support the jury's verdict, we affirm.
 {¶ 2} By indictment filed December 16, 2004, defendant was charged with one count of aggravated burglary and two counts of kidnapping, all felonies of the first degree, as well as one count of menacing by stalking, a fourth-degree felony. Defendant entered a not guilty plea to the charges, and trial commenced on April 26, 2005. During the course of the trial, the state requested that the trial court enter a nolle prosequi concerning the third count of the indictment alleging that defendant kidnapped his son. The remaining counts were submitted to the jury at the conclusion of the trial. The jury returned not guilty verdicts to the burglary and kidnapping charges, but found defendant guilty of menacing by stalking. The trial court sentenced defendant accordingly.
 {¶ 3} Defendant's assignment of error first challenges the sufficiency of the state's evidence regarding venue. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. Sufficiency is a test of adequacy. Id. We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Statev. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 4} "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant." State v.Headley (1983), 6 Ohio St.3d 475, 477. "[A] defendant waives the right to challenge venue when the issue is raised for the first time on appeal." State v. Wheat, Franklin App. No. 05AP-30,2005-Ohio-6958, at ¶ 10.
 {¶ 5} Here, the state placed the victim on the witness stand, and she testified that her apartment, the site of some of defendant's menacing activity, is located in Franklin County. At trial, defendant did not challenge the accuracy of the victim's testimony; nor did defendant suggest the trial court take judicial notice of the actual location of the victim's apartment. Instead, on appeal, defendant for the first time asks this court to take judicial notice that the victim's apartment is located outside Franklin County. Under the circumstances of this case, defendant's contention is unpersuasive.
 {¶ 6} Initially, defendant's failure to raise the venue issue at trial waives all but plain error. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B), however, places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, an error must exist. State v. Hill (2001), 92 Ohio St.3d 191, 200. Second, the error must be plain. To be plain within the meaning of Crim.R. 52(B), an error must be an obvious defect in the trial proceedings. State v. Barnes, 94 Ohio St.3d 21, 27,2002-Ohio-68; State v. Sanders (2001), 92 Ohio St.3d 245, 257. Third, the error must have affected defendant's substantial rights, meaning that the trial court's error must have affected the outcome of the trial. See Hill, supra, at 205; State v.Moreland (1990), 50 Ohio St.3d 58, 62; State v. Long (1978),53 Ohio St.2d 91, at paragraph two of the syllabus.
 {¶ 7} Defendant contends the error here is obvious and affects the outcome of the trial. Specifically, defendant points out that if we take judicial notice of the fact that the victim's apartment is located outside Franklin County, the state will have failed to prove venue. In response, the state contends that if this court takes judicial notice of the location of the victim's apartment, we also should take judicial notice that Maryhaven, another site of defendant's menacing activity, is located within Franklin County.
 {¶ 8} In Hubbard v. Luchansky (Apr. 10, 1995), Trumbull App. No. 94-T-5067, appeal not allowed, 73 Ohio St.3d 1426, the court addressed a contention similar to defendant's argument here, observing that "[a]s a general proposition, an appellate court has the authority to take judicial notice of any fact of which the trial court could have taken notice." Id., citingState v. Thomas (Jan. 8, 1993), Lake App. No. 92-L-020. The court explained that "the courts of this state have consistently held that an appellate court can take judicial notice of a matter even if the trial court failed to do so, or if the issue has not been raised by the parties." Luchansky, supra. The court, however, noted that the line of cases applying the general proposition "dealt exclusively with the taking of notice of the municipal ordinance or regulation upon which the prosecution is based, i.e., the taking of notice pertaining to a question of law as compared to a question of fact." Id.
 {¶ 9} Addressing whether an appellate court should take judicial notice of the location of a street being within the trial court's jurisdiction, the court stated that "courts in other jurisdictions have reached a different conclusion in relation to questions of fact. These courts have held that when a trial court fails to take judicial notice of a factual matter because a party did not raise the issue, an appellate court will not consider the fact in reviewing the appealed judgment." Id. In adopting that stance, the court emphasized "that the rule as to taking notice of factual matters is consistent with the fundamental appellate principle that a reviewing court cannot decide an appeal based upon factual matters which were not before the trial court. * * * In addition, the rule is likewise consistent with the appellate principle that a party will be deemed to have waived any error to which the party failed to object." Id.
 {¶ 10} Consistent with the rationale set forth inLuchansky, we decline defendant's invitation to supplement the record, either through judicial notice or otherwise, with facts not presently in the record. Moreover, even if we were to take judicial notice that the victim's residence is outside Franklin County, we would likewise take judicial notice that Maryhaven is located within the county, as we discern no basis for disparately treating the two parties. In the end, however, because defendant failed to raise the issue in the trial court and failed to request that the trial court take judicial notice of the location of the victim's apartment, defendant's argument concerning the sufficiency of the venue evidence lacks merit.
 {¶ 11} The second portion of defendant's single assignment of error challenges the manifest weight of the evidence supporting his conviction for menacing by stalking. Defendant contends that although the victim testified she feared defendant and he caused her mental distress, the evidence concerning the victim's actions toward defendant renders her testimony untrustworthy and the verdict against the manifest weight of the evidence.
 {¶ 12} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Conley, supra; Thompkins, at 387 (noting that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). Determinations of credibility and weight of the testimony remain within the province of the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury thus may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill
(1964), 176 Ohio St. 61, 67.
 {¶ 13} R.C. 2903.211(A)(1) provides that "no person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." The victim, her sister, her son, her brother-in-law, and two of her co-employees all testified to the circumstances giving rise to defendant's conviction.
 {¶ 14} According to the victim, she and defendant met in a crack house approximately 11 years prior to trial. While the victim readily admitted to abusing drugs for a period of time, she testified to detoxification through Maryhaven, Choices, and Amethyst. At the time of trial, she had been "sober and clean" for almost seven years. (Tr. 28.) Although the victim continued to have a relationship with defendant and resided with him after her detoxification, she ultimately determined that she needed to change that aspect of her life. On August 3, 2003, the victim and her son A.C., a child born of her relationship with defendant, moved out of defendant's residence and into an apartment in the same complex where her sister lived.
 {¶ 15} Despite her desire to have defendant out of her life, she recognized defendant to be the father of her son, and she wanted her son to grow up knowing his father. She thus did not preclude defendant's access to A.C. and, as a result, to herself as well. The victim further admitted that, even after moving to her own apartment, she sporadically was sexually involved with defendant. She testified, however, that defendant never lived in her apartment and had no key to it. According to the victim, defendant was not allowed to be in her apartment when she was not present, except perhaps to watch their son.
 {¶ 16} On October 8, 2004, she went to dinner with an acquaintance after completing her day's work at Maryhaven. She prearranged for her sister to take A.C., with his cousin, to an East High football game. After A.C. arrived home from school, but before his aunt was ready to leave for the football game, someone dropped defendant off at the victim's apartment; defendant asked to do laundry at the apartment, and A.C. allowed him into the residence. When A.C.'s aunt called to take A.C. to the game, defendant refused to allow him to leave.
 {¶ 17} According to A.C., he missed the football game because defendant was angry and would not let him out of the house. Holding a butcher knife, defendant told A.C. he was going to kill the victim. A.C. began to cry, so defendant called the victim's sister and told A.C. he could go to his aunt's apartment. When A.C. told his aunt what defendant said, she called the police. After the police arrived and conducted their inquiry, they advised they could not force defendant to leave because the victim's sister did not live in the apartment at issue. The victim's sister then took her own son and A.C. to the football game, but because of the lapse of time, the game was nearly over. She ultimately returned to the victim's apartment to return A.C. to his mother.
 {¶ 18} In the meantime, after dining with her acquaintance, the victim returned to the Maryhaven parking lot to pick up her car. A message from the guard and a phone call from her mother caused the victim to realize defendant was in her apartment. She called him, and he recognized she was in the parking lot as they spoke. He came out to get her, they walked to the apartment, and he locked the door. He calmly walked her down the hallway toward her bedroom, but then grabbed her hair, threw her on the bed and demanded to know whether she had sexual relations with her dinner partner. All the while he was screaming, cursing, and yelling at her, with his fists balled up over her face as if to hit her. He then backed away, sat on the bed next to her, and talked to her.
 {¶ 19} At that point, the victim's sister knocked on the door, and the victim asked that her son be brought back into the apartment. Defendant became calm enough to ask the victim to take him home. The victim recognized her only control over defendant, her only "weapon," was to have sex with him. (Tr. 60.) She initiated sex with him at his residence, it calmed him, and it allowed her to leave and return to her apartment.
 {¶ 20} Shortly after the incident involving the football game, defendant called the victim on a Sunday and told her, "If you meet me in the park, if you meet me for one hour, I promise, I will leave you alone forever." (Tr. 63.) In the park, they discussed their common experiences, and defendant said, "If you have sex with me one last time, I swear on grandma's grave I will not bother you any more. I will not hurt you." Id. The victim complied and then went home.
 {¶ 21} A short time later, the victim was driving with A.C. when he told her, "Mommy, when Daddy was in the house with me Friday, he had a butcher knife in his hand and looked at me and said, `When your mom walks in that door, I'm going to kill her and make you watch.'"(Tr. 65.) From that point in time, the victim did not see defendant; she called defendant and told him, "That's it." (Tr. 66.) At some later point, A.C. informed the victim that defendant smashed a glass figurine in her bedroom the evening of the football game; she also discovered defendant slashed many of the clothes in her closet.
 {¶ 22} After that, defendant persistently called her at her home, her job, and on her cell phone. He called one night at about 3:00 a.m., and she told him, "This is ridiculous and I'm going back to sleep." (Tr. 71.) She awoke about one hour later to defendant's banging on her apartment door. When she opened the door to avert a scene, defendant pushed past her to her bedroom and to A.C.'s room to see if the victim had a male guest at the apartment. After about one hour, defendant asked the victim to take him home, as his car was inoperable. The victim complied, and when she returned she found A.C. awake, her sister on the sofa, and the telephone ringing. A.C. was upset that the victim was not in the apartment when he awoke, and defendant was calling on her telephone. According to the victim, defendant called "obsessively"; by her estimates, he called about 1,000 times in two months. (Tr. 73.)
 {¶ 23} Shortly after the November election in 2004, the victim and her sister went to a restaurant to eat and talk after saying goodbye to their parents, who temporarily were leaving the city. The victim's cell phone started to ring approximately every 20 seconds. The victim's sister told her to reject the calls, but defendant continued to call. The victim ultimately answered the call and asked defendant, who was angry, what he wanted. She explained that she was at a restaurant with her sister, but testified she was afraid to tell him her parents were leaving: with her father out of the city, she felt she was without protection. Defendant said he did not believe she was in a restaurant with her sister, so he instructed the victim to hand the phone to her sister; her sister confirmed they were at the restaurant talking. When her sister handed the phone back to the victim, defendant said, "I'm going to kill that black, bald-headed bitch." (Tr. 81.) The victim was hurt, angry, scared and very tired. When the victim inquired about the threat, defendant said, "[W]ell, she called the police on me * * * I'm going to kill her because you love her. I'm going to kill her because you love her." (Tr. 82.)
 {¶ 24} The victim's sister heard defendant's threat and began to cry; they went to a third sister's home, where their sister's husband, called defendant and resolved the anger of the evening. The victim, however, continued to receive calls and letters from defendant. One morning the victim was getting ready for work when defendant called and told her, "[L]et me tell you something. I'm going to the seminar today and when you get home, I will be at your apartment. I'm moving in. You will stop seeing your friend, and we are getting married." (Tr. 84.) The victim went to the law enforcement and eventually procured a protection order, but police were unable to serve defendant. The victim was too afraid to return to her apartment, so she and her sister both moved into the third sister's home where they stayed for approximately 10 to 12 days. She and her sister were so frightened they each purchased a gun.
 {¶ 25} Defendant did not confine his actions to the victim's apartment. He frequently called the victim's workplace and even drove onto the property, compelling Maryhaven to force all its clients inside due to an unidentified car on the property. A co-worker testified that when defendant came to Maryhaven, he knocked on the door and asked for that "bitch." (Tr. Vol. II, 39.) Although defendant thought he saw the victim, the co-employee assured him that the person he saw was not the victim. In response, defendant said, "[L]et her know that I'm looking for her and I want to kill her." Id.
 {¶ 26} Indeed, defendant's actions at one point provoked a call from Maryhaven to the victim advising that because of defendant's actions, she was not to come back to work. The victim's phone call to her director's boss gained her the opportunity to return to work, but Maryhaven hired a guard to follow her everywhere she went. On arriving at work, she was required to call from her cell phone to have the guard meet her at the parking lot. When she used the restroom, he stood outside; when she was ready to leave work for the day, he walked her to her car.
 {¶ 27} Despite the victim's substantial testimony explaining the degree to which she feared defendant, defendant asserts the conviction is against the manifest weight of the evidence. Defendant contends the victim's testimony lacked credibility because, despite her professed fear of defendant, she answered his phone calls, met with him, had sex with him, and thereby gave him mixed messages about their relationship. Even if we were to agree with defendant that, for a period of time, the victim was equivocal in her actions toward defendant, her testimony clearly indicated that after she moved to her apartment, she set boundaries for defendant that he was unwilling to observe. The state presented evidence that, after the victim obtained her separate residence, defendant threatened to kill the victim in A.C.'s presence, threatened at Maryhaven to kill the victim, and threatened to kill the victim's sister. Moreover, as evidence that defendant's actions caused the victim to fell threatened, the state presented testimony that the victim and her sister moved out of their respective apartments into a third sister's home in an effort to conceal themselves, the victim removed A.C. from school during that period, and the victim and her sister both purchased guns for protection.
 {¶ 28} In the final analysis, the victim presented substantial evidence that defendant caused her not only to feel afraid, but to act on that fear. Indeed, the evidence included defendant's admission that his actions caused the victim to feel threatened: his letter to the victim stated that "for you to feel threatened by me makes my heart want to stop." (Tr. 75.). While defendant presented his own interpretation of the evidence, the jury was charged with the duty to assess credibility and apparently concluded the victim was the more credible witness. The fact that differing versions of the events were presented to the jury through the testimony of the victim and defendant does not render the jury's decision against the manifest weight of the evidence.
 {¶ 29} Accordingly, defendant's motion that we take judicial notice of the location of the victim's apartment is denied, defendant's single assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed; motion denied.
Bryant, Petree and Brown, JJ., concur.