DECISION AND JUDGMENT ENTRY
{¶ 1} Leopold Guidry ("Appellant") appeals the judgments of the Washington County Court of Common Pleas finding him guilty of murder in violation of R.C. 2903.02(B) and denying his motion for a new trial. The Appellant contends the trial court erred when it denied his motion for a new trial, issued erroneous jury instructions, and determined that the manifest weight of the evidence supported his conviction. Because we find that a new trial was not warranted, the trial court's jury instructions were properly given, and the State ("Appellee") presented substantial evidence upon which *Page 2 
the jury could reasonably conclude that all the essential elements of murder had been established beyond a reasonable doubt, we affirm the judgment of the trial court.
 I. Facts {¶ 2} Falicia Guidry was born on September 11, 2003, to Alicia Hanson and the Appellant. The three resided together, along with Ms. Hanson's three-year old daughter, Ashley. Ms. Hanson testified at trial that she went to bed sick between 8:00 and 8:30 p.m. on the evening of November 25, 2003. At approximately 9:30 p.m., the Appellant woke her up to tell her there was something wrong with Falicia. The Appellant told Ms. Hanson that Falicia had vomited and stopped breathing. At that point, Ms. Hanson attempted CPR on Falicia and then called the emergency squad, which attempted artificial respiration and transported her to Marietta Memorial Hospital. During the time the squad members attempted artificial respiration on the child, she had no pulse or spontaneous respiration. She was later transported to Children's Hospital in Columbus. She died two days later.
 {¶ 3} Dr. Collie Trant, a forensic pathologist who performed an autopsy on Falicia, testified that she died because she had sustained blunt force trauma to her head, which caused irreversible swelling. He also *Page 3 
testified that he found old injuries to Falicia, specifically broken ribs and another injury to her head. Dr. Philip Scribano, Falicia's treating physician at Children's Hospital, also testified that Falicia had suffered impact to her head that caused severe damage to her brain stem. He testified that the damage to her brain stem in turn caused her to experience heart and lung arrest. He also testified that the injuries Falicia sustained would have caused the damage to her brain stem and heart and lung arrest immediately or within moments after impact.
 {¶ 4} Detective Mark Warden interviewed the Appellant at Children's Hospital prior to Falicia's death. He told Detective Warden and the doctors that he fed Falicia, burped her, and that she had fallen asleep, so he laid her on the couch. He said he had gone to the bathroom, and when he returned, Falicia was in distress. While Detective Warden was speaking with the Appellant and Ms. Hanson, Dr. Scribano asked if there was some other way they could explain Falicia's head injury. At this point, the Appellant said that the family had been staying at a friend's house when Falicia was first born, and that someone could have stepped on her while she was sleeping on the floor there.
 {¶ 5} Detective Warden subsequently interviewed Ms. Hanson separately. She told him that on an earlier occasion, when she was trying to *Page 4 
sleep and the baby was crying, she had shaken the baby and then punched her in the head. Ms. Hanson also testified to this set of facts, but then recanted her statement on cross examination.
 {¶ 6} After Falicia died, Children's Services employee Jim McKenna interviewed the Appellant. When Mr. McKenna asked how the Appellant thought Falicia had sustained the injuries, the Appellant noted that he had seen Ms. Hanson's other daughter, Ashley, bouncing on the bed and that she had fallen on Falicia. He also recalled that another child in the home had "possibly dropped" a toy truck on Falicia. The Appellant told Mr. McKenna that Ms. Hanson didn't know about these events despite the fact that he really wanted to tell her, because he forgot to relate them to her. He went on to say, "I forget really important things all the time."
 {¶ 7} The Appellant also discussed the possibility of taking a polygraph test with Mr. McKenna. He noted his concern about polygraphs, stating "[y]ou can ask me the same question five times, and I can tell you the god-honest truth and probably one or two of those times, it'd say I'm lying." He likewise noted, "I mean, I'll take [a polygraph test], to see if it comes out, see how the results come out, but if it's saying I'm lying about something that I'm telling the truth about, then that's bull___[.]" During the *Page 5 
interview, the Appellant also told Mr. McKenna that he had been in counseling for what he believed was anger management.
 {¶ 8} Later in the interview, Detectives Warden and Schuck began questioning the Appellant about his prior comments suggesting someone had stepped on Falicia. When the detectives began this line of questioning, the Appellant stated, "[y]eah, but there's a whole list of things I think may have happened." He then began explaining a number of scenarios he thought may have been the source of Falicia's life-ending injury. Throughout each of these explanations, the Appellant consistently noted that Ms. Hanson was in bed when Falicia became ill. He also claimed memory loss or distortion periodically throughout his explanations.
 {¶ 9} At one point while explaining these scenarios, the Appellant claimed that Falicia sustained an injury to her head on November 25 while Ms. Hanson was holding her. He also described for the detectives another incident in which he thought Ms. Hanson had been too rough with Falicia, tossing her onto the couch. He also told Detective Warden that Ms. Hanson had struck him previously.
 {¶ 10} At that time, Detective Schuck apprised the Appellant that other officers were simultaneously interviewing Ms. Hanson, and that she denied dropping Falicia. The Appellant answered, "Well, she's sticking to what she *Page 6 
said. Well, let her go down herself, then." Shortly thereafter, he reiterated his concerns about his memory, stating, "[t]here's certain things that happened in the past, that I might think happened yesterday." Later he stated "[m]aybe it wasn't [inaudible] that that happened. Maybe it was something that I seen in television that I may have possibly * * *[.]" Shortly thereafter, he said, "Maybe it was something in the past that maybe didn't happen that time, but it happened a long time ago, maybe it was my mom or something."
 {¶ 11} As Detectives Warden and Schuck continued their conversation with him, the Appellant again reverted to suggesting that Ms. Hanson had caused Falicia's injury. When Detective Warden asked the Appellant to tell him and Detective Schuck exactly what happened, the Appellant replied, "Now with the way that — well, Alicia's mom's background is? It's a possibility that she did what she told you. She never admitted it to me."
 {¶ 12} The Appellant then advanced two different possibilities for the source of Falicia's injury. He stated that Ms. Hanson's three year old daughter Ashley had pulled Falicia away from him at one point, causing her to fall on her head. Next, he stated that he had tossed Falicia into the air and then dropped her, causing her to fall on her head. He also commented at the end of his interview with Detectives Warden and Schuck that he was angry *Page 7 
with Ms. Hanson for lying and although he said that Ms. Hanson had not hit the baby, he wasn't sure about whether she had caused Falicia's rib injury. He also indicated concern that Ms. Hanson would find out what he had told the detectives.
 {¶ 13} The next interview took place on December 24, 2003. Detectives Warden and Johnson interviewed the Appellant. During this interview, the Appellant again stated that Ms. Hanson was asleep when Falicia went into physical distress. He also stated that he couldn't remember exactly what he had previously told detectives about the circumstances surrounding Falicia's death. He hinted that Ms. Hanson may have done something to Falicia while he was gone. He also suggested that the fact that he dropped Falicia may have exacerbated an injury Ms. Hanson had caused Falicia earlier. He noted, "I don't believe she could have hit our daughter, but there's always your point of view. There's a possibility that within that time that I was gone that she did something possibly and didn't tell me about it, and then when I came back and I dropped the child * * *[.]"
 {¶ 14} Detectives Warden and Johnson stressed that the medical professionals that examined Falicia indicated her death was caused by blunt force trauma to the head, but that it couldn't have been caused by him dropping her. At this point, the Appellant suggested that someone had *Page 8 
punched Falicia. Later in the interview, Detective Warden asked the Appellant if it was possible that he struck Falicia. Appellant said, "Well maybe the reason why I can't recall it is because there's a possibility that I did do it and didn't realize it." He also said later, "I don't know if I struck her. I can't say that I did because I can't remember if I did or not."
 {¶ 15} Ultimately, the Appellant confessed that he hit Falicia as she lied on the couch next to him because she was crying when he was trying to hear a particular part of the movie he was watching. He was arrested and a jury trial on the matter was held on July 19 through 22, 2004. The jury found the Appellant guilty of murder in violation of R.C.2903.02(B), and on August 27, 2004, he was sentenced to life in prison with the possibility of parole. On September 24, 2004, he filed a notice of appeal from that decision with this court.
 {¶ 16} On August 19, 2004, the Appellant filed a motion for a new trial based on newly discovered evidence. The newly discovered evidence consisted of multiple statements Ms. Hanson had made after the jury's verdict, admitting responsibility for Falicia's death. On August 24, 2004, the trial court began an evidentiary hearing on his motion, in which several witnesses, including Ms. Hanson, were called to testify. During Ms. Hanson's testimony, trial counsel requested a recess to conduct scientific *Page 9 
tests on a confession letter written by Ms. Hanson. During this period, officers also began reviewing tapes of phone conversations between the Appellant and Ms. Hanson that occurred while the Appellant was in jail. The following exchange occurred between the Appellant and Ms. Hanson while the Appellant was in jail:
 APPELLANT: "[T]here's only one thing you could say * * * that would save me.
 MS. HANSON: What it is? That I killed her?
 APPELLANT: No, no you don't say it like that. You say something like — when I was in the bathroom, yeah, you way pretty much what they got on me-on that tape * * * so the only way I'll be able to get out of all of this is if you keep holding that that was true, that, that you woke up, you walked out of the room, you grabbed her by the neck and carry her, but you did not in turn killing her." (Sic).
 {¶ 17} In the same call, the Appellant instructed Ms. Hanson to say that she had hit Falicia because she was crying. Ms. Hanson told him that she would comply with his request "if you want me to say that." He also insisted that she would not be taken into custody upon taking blame for Falicia's death, that his charges would be dismissed, and that the authorities would not have enough evidence to convict her. He also alluded to the fact that after her confession was recorded and he was released, they would be "long gone," fleeing to Mexico. *Page 10 
 {¶ 18} As their discussions continued, the Appellant attempted to script Ms. Hanson's false confession:
 MS. HANSON: "So what am I supposed to tell them, that whenever you said that you seen me, that was the truth, that you seen me, that I picked up Falicia by the neck and cut her?
 APPELLANT: Yeah. You don't have to get really graphic with it or anything. You just —
 MS. HANSON: They're gonna want me to.
 APPELLANT: Just tell them that you picked her up with your, whatever hand you, you wanna tell them your left hand hit and hurt it with your right hand * * * [.]"
 {¶ 19} Later in the conversation, the following exchange took place:
 APPELLANT: "Yeah. And I'll tell you exactly how they wanna hear it. You know how they wanna hear it, right?
 MS. HANSON: She was crying and I picked her up by the neck, and I hit her on top of the head, right?
 APPELLANT: Yeah, that's pretty much what they're saying. I love you so much."
 {¶ 20} Additionally, the Appellant told Ms. Hanson to write a letter to his attorney, Janet McKim, confessing that she hit Falicia on the night that she died. He told Ms. Hanson that writing such a letter would be "sorta like immunity" because she didn't verbally admit to it. He also said that his attorney told him that such a letter would change his legal situation. *Page 11 
 {¶ 21} During the same time period, certain phone calls between Ms. Hanson and another inmate were also recorded. In spite of her plans to confess to help the Appellant, Ms. Hanson told the other inmate that at the time Falicia was killed, she was in bed with her daughter Ashley. Additionally, she continued to deny that she hurt Falicia in the context of her conversations with the Appellant. In one conversation with the Appellant, Ms. Hanson stated:
 "Well, I know that I didn't, but look what the f*** I'm doin'. I'm ruinin' my damn life because I'm protectin' you. I'm gonna lose my daughter because of this. I didn't f***in' do it * * *[.]"
 {¶ 22} Despite denying that she killed Falicia, Ms. Hanson told the Appellant's mother during a phone conversation the Appellant's mother recorded that she wrote the letter the Appellant requested and mailed it. Ms. Hanson told the Appellant's mother that she wrote, "Dear Janet, On November 25th, 2003, I, Alicia Hanson, picked Falicia Guidry, my daughter, up by the neck and hit her on the head while Leo Guidry, my fiancé, was in the bathroom." While testifying at the evidentiary hearing on the motion for a new trial, the Appellant's mother, however, admitted that during a subsequent phone conversation between Ms. Hanson and herself, Ms. Hanson recanted her confession, as set forth in the letter to Janet McKim, *Page 12 
and told her that she didn't know how Falicia died because she was in bed at the time.
 {¶ 23} When the Appellant testified at the evidentiary hearing on the motion for a new trial, he stated that he called Detective Warden to tell him he had heard Ms. Hanson assault Falicia because he (the Appellant) had reviewed all the evidence. He claimed he originally confessed in order to protect Ms. Hanson, but he didn't explain why he changed his mind and told Detective Warden that he saw Ms. Hanson kill Falicia or why he asked her to confess.
 {¶ 24} At the time the evidentiary hearing convened, Ms. Hanson denied writing the confession letter to Janet McKim, the Appellant's attorney. She took the Fifth Amendment at the second hearing. Later the parties stipulated that her DNA had been found on the letter and that she had written the letter.
 {¶ 25} The evidentiary hearing was concluded on December 12, 2005, and thereafter the parties submitted briefs on the issue of a new trial. On July 26, 2006, the trial court denied the Appellant's motion for a new trial, and on August 3, 2006, he filed a notice of appeal from the court's decision. He also filed a motion to lift the stay of the proceedings in his appeal from the trial court's August 27, 2004 decision, along with a motion to *Page 13 
consolidate the two cases for review. This court granted his motions, and we now review the following assignments of error pertaining to the decisions in Washington County case numbers 04CA36 and 06CA36:
 {¶ 26} 1. THE TRIAL COURT ERRED WHEN IT DENIED MR. GUIDRY'S MOTION FOR NEW TRIAL AND DEPRIVED MR. GUIDRY OF HIS RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 27} 2. THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY REGARDING RENDERING A VERDICT, AND WHEN THE WRITTEN JURY INSTRUCTIONS INCLUDED IRRELEVANT MATTERS. THE COURT'S ERRONEOUS JURY INSTRUCTIONS CONSTITUTED PLAIN ERROR, CRIM.R. 52(B), AND DEPRIVED MR. GUIDRY OF HIS RIGHT TO A FAIR TRIAL BEFORE A PROPERLY INSTRUCTED JURY. FIFTH ANDFOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; SECTION 16, ARTICLE I, OHIO CONSTITUTION.
 {¶ 28} 3. MR. GUIDRY'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. Motion for New Trial {¶ 29} In his first assignment of error, the Appellant argues that the trial court erred when it denied his motion for a new trial. The decision whether to grant or deny a motion for new trial on the basis of newly discovered evidence is committed to the sound discretion of the trial court. State v. Williams (1975), 43 Ohio St.2d 88, 330 NE.2d 891, paragraph two *Page 14 
of the syllabus. See, also, State v. Matthews (1998), 81 Ohio St.3d 375,691 N.E.2d 1041, citing State v. Schiebel (1990), 55 Ohio St.3d 71,564 N.E.2d 54, paragraph one of the syllabus. We will not reverse a trial court's denial of a motion for new trial absent an abuse of that discretion. State v. Hawkins (1993), 66 Ohio St.3d 339, 350,612 N.E.2d 1227; Williams at paragraph two of the syllabus. An abuse of discretion is more than a mere error in judgment; it implies that a court's ruling is unreasonable, arbitrary, or unconscionable. Richard v. Seidner
(1996), 76 Ohio St.3d 149, 666 N.E.2d 1134; Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 30} A convicted offender seeking a new trial based on the grounds of newly discovered evidence bears the burden of demonstrating to the trial court that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." State v.Petro (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus;Hawkins at 350. *Page 15 
 {¶ 31} Given the evidence upon which the Appellant relies, it was not an abuse of discretion for the trial court to deny the Appellant's motion for a new trial. The Appellant relied upon recanted testimony given by his fiancé, Ms. Hanson, that he asked her to provide so that he could escape his sentence. The Appellant went so far as to craft the confession that Ms. Hanson sent to Janet McKim.
 {¶ 32} Newly discovered evidence which purportedly recants testimony given at trial is "looked upon with the utmost suspicion." State v.Wilburn (Dec. 22, 1999), Lawrence App. No. 98CA47, 1999 WL 1281507. When a motion for a new trial based on the recantation of trial testimony is brought in the trial court, the court must determine which of the contradictory testimonies of the recanting witness is credible and true and would the recanted testimony have materially affected the outcome of the trial. State v. Pirman (1994), 94 Ohio App.3d 203, 209,640 NE.2d 575. Based on the various statements made by Ms. Hanson and the Appellant, it was not an abuse of discretion for the trial court to find that her confession, as set forth in her letter to Janet McKim, was not credible or true. In light of the lack of credibility of the newly discovered evidence advanced by the Appellant, there is no probability that the new evidence would change the outcome of the case if a new trial was granted. Thus, the Appellant did not *Page 16 
meet his burden under the first prong of Petro, supra. Accordingly, his first assignment of error is overruled.
 III. Jury Instructions {¶ 33} In his second assignment of error, the Appellant argues that the trial court erred when it gave the jury instructions on rendering a verdict, and instructed jurors on irrelevant matters. He contends the error resulting from these improper instructions is plain error which deprived him of his right to a fair trial. Because the Appellant failed to object to the instructions given below, we can only review them for plain error. See generally State v. Gordon (1971), 28 Ohio St.2d 45,276 N.E.2d 243, paragraph two of the syllabus.
 {¶ 34} The doctrine of plain error is governed by CrimR. 52(B). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." For a reviewing court to find plain error, three conditions must exist: (1) an error in the proceedings; (2) the error must be plain, i.e., the error must be an "obvious" defect in the trial proceedings; and (3) the error must have affected "substantial right," i.e., the trial court's error must have affected the outcome of the trial.State v. Parish, Washington App. Nos. 05CA14 and 05CA15, 2005-Ohio-7109, at ¶ 18, citing State v. Noling, 98 Ohio St.3d 44, *Page 17 
56, 2002-Ohio-7044, 781 N.E.2d 88; State v. Barnes, 94 Ohio St.3d 21,27, 2002-Ohio-68, 759 N.E.2d 1240; State v. Sanders (2001),92 Ohio St.3d 245, 257, 750 N.E.2d 90; State v. Hill (2001), 92 Ohio St.3d 191,200, 749 N.E.2d 274. Additionally, the Ohio Supreme Court has stated that Crim.R. 52(B) is to be invoked "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Parish, supra, at ¶ 18, citing State v. Landrum (1990), 53 Ohio S.3d 107, 111, 559 N.E.2d 710; State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804, ¶ 3 of the syllabus. A reviewing court should consider noticing plain error only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.Parish, supra, at ¶ 18, citing Barnes, 94 Ohio St.3d at 27; UnitedStates v. Olano (1993), 507 U.S. 725, 736, 113 S.Ct. 1770; United Statesv. Atkinson (1936), 297 U.S. 157, 160, 56 S.Ct. 391.
 {¶ 35} The Appellant complains about three aspects of the jury instructions given by the trial court. First, the Appellant contends that the trial court erroneously instructed the jurors, "[i]f you find that the State has failed to prove each and every element of this offense beyond a reasonable doubt, your verdict would be not guilty." The Appellant contends that this is an incorrect statement of law, and that a correct instruction would instruct *Page 18 
the jury that it must acquit the defendant if the State fails to prove a single element of the offense charged. We find that the trial court's instruction was a proper statement of the law. The trial court's instruction contemplates that the Appellee must prove each element, including the mens rea of the crime, in order for the jury to properly return a guilty verdict. Use of the word "each" conveys the requirement that the elements must be viewed individually. See State v. Conner (June 27, 1996), Cuyahoga App. No. 65385, 1996 WL 355287, at *3. As such, the trial court's instruction was proper.
 {¶ 36} The second instruction the Appellant complains about is based on the order in which the trial court used the words "guilty" and "not guilty" in its instruction. When reading the jury verdict forms, the trial court stated the following:
 "We the jury, find the Defendant, Leopold Guidry," and then there's a blank space. And in this blank space, you're going to insert, in accordance with your findings — and it's important to follow the order in which I have used these words — "of the offense of murder, by committing the offense of felonious assault, felony of the second degree, in violation of the Ohio Revised Code Section 2903.02(B).
 There's a place to insert the date and 12 signature lines. And what you do is, you reach an agreement, and then in this — in this blank space, you're going to put either the word `guilty' or `not guilty,' depending on your findings." *Page 19 
(Emphasis added). The Appellant argues that this instruction was problematic, in that it conveyed to the jury the impression that the word "guilty," which preceded the words "not guilty," was more important to the jury's decision. He contends this erroneous instruction directed the jury to a guilty verdict. We do not find that the order of the court's usage of the words guilty and not guilty was outcome determinative in the case sub judice. Accordingly, plain error did not occur.
 {¶ 37} The final instruction about which the Appellant complains is that the trial court failed to redact references in the written instructions to testimony by the Appellant. The Appellant contends that this failure "unfairly highlighted" his choice not to testify. Appellant overlooks the fact that the trial court specifically instructed the jury that it could not consider the fact that Appellant did not testify. This instruction functioned as a curative instruction. Because juries are presumed to follow their instructions, including curative instructions, we must assume that the jury in the case sub judice did not consider the fact that the Appellant did not testify. In light of this consideration, we find no error tied to this instruction. Because we find that each of the aforementioned instructions is proper, we find the Appellant's second assignment of error to be meritless, and accordingly overrule it. *Page 20 
 IV. Manifest Weight of the Evidence {¶ 38} In his third assignment of error, the Appellant argues that the trial court's judgment is against the manifest weight of the evidence. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, our role is to determine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy (1998),84 Ohio St.3d 180, 193, 702 N.E.2d 866. The reviewing court must dutifully examine the entire record, weighing the evidence and considering the credibility of witnesses, keeping in mind that credibility generally is an issue for the trier of fact to resolve.State v. Thomas (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356; State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The reviewing court may reverse the conviction if it appears that the fact finder, in resolving evidentiary conflicts, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thomphns (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. On the other hand, we will not reverse a conviction if the state presented substantial evidence upon which the trier of fact could reasonably conclude that all essential elements of the offense had *Page 21 
been established beyond a reasonable doubt. State v. Eley (1978),56 Ohio St.2d 169, 383 N.E.2d 132, syllabus.
 {¶ 39} Having thoroughly reviewed the evidence presented, we find that the Appellee has presented substantial evidence upon which the jury could reasonably conclude that the essential elements of murder under R.C. 2903.02(B) had been established beyond a reasonable doubt. Thus, we overrule the Appellant's third assignment of error.
 V. Conclusion {¶ 40} In our view, the trial court did not abuse its discretion when it refused to grant the Appellant's motion for a new trial. Likewise, there was no plain error attached to the trial court's jury instructions. Additionally, the Appellant's conviction was supported by substantial evidence upon which the jury could reasonably conclude that he was guilty of the charged crime. Accordingly, we affirm the judgment of the trial court.
 JUDGMENT AFFIRMED. *Page 22 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed. The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, J.: Concurs in Judgment and Opinion.
Harsha, J.: Concurs in Judgment and Opinion as to Assignments of Error I and II; Concurs in Judgment Only as to Assignment of Error III. *Page 1