[Cite as *In re K.S.*, 2017-Ohio-7383.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re K.S.

Court of Appeals No. L-16-1298

Trial Court No. JC 15249568

**DECISION AND JUDGMENT**

Decided:  August 29, 2017

* * * * *

Adam H. Houser, for appellant.

Shelby J. Cully, for appellee.

* * * * *

**MAYLE, J.**

**{¶ 1}** R.K. is the father of K.S.  He appeals the November 23, 2016 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which terminated his parental rights and awarded permanent custody of his daughter to Lucas County

Children's Services ("LCCS"). For the reasons that follow, we affirm the trial court's judgment.

## I.  Background

### A.  K.S. comes to the attention of LCCS.

{¶ 2} K.S. ("child") was born to A.S. ("mother") in December of 2013. In early July of 2015, mother left the child with J.W., the child's maternal grandmother ("grandmother"). She left no clothes or supplies for the child's care, nor did she furnish authorizations necessary to obtain medical treatment. Grandmother returned the child to mother about three weeks later, but mother left the child with another relative the following day with instructions that she once again be given to grandmother.

{¶ 3} On July 30, 2015, LCCS received a referral alleging that mother was heavily involved with drugs and alcohol. An LCCS caseworker met with the child and grandmother on July 31, 2015. Attempts were made to reach mother, but were unsuccessful.

{¶ 4} On August 12, 2015, grandmother contacted LCCS requesting assistance. LCCS located mother, but mother insisted that she could not care for the child due to depression, anxiety, panic attacks, ADHD, and cognitive delays for which she receives social security income. LCCS also received reports indicating that mother had been involved in domestic violence incidents with two men, that she allows many people in and out of her home, and that she has engaged in prostitution.

2.

**B. LCCS files a complaint in dependency and a case plan is developed.**

{¶ 5} On August 19, 2015, LCCS filed a complaint in dependency and neglect and a motion for shelter care. R.K. was identified in that complaint as the putative father of the child, however, paternity had not yet been established. Another man was ruled out as the father by genetic testing.

{¶ 6} LCCS was granted interim temporary custody of the child, and the child was placed in foster care. On August 24, 2015, the trial court appointed a guardian ad litem ("GAL") for the child.

{¶ 7} A case plan was developed with a goal of reunification. R.K.'s paternity was established in October of 2015, and the following services were mandated for both parents: dual assessments; substance abuse services; mental health services; parenting services; resource management services; and domestic violence services. Necessary services were also identified for the child to address a number of diagnoses, including adjustment disorder, global development delay, behavior change, speech delay, facial dysmorphism, and sensory processing disorder. The case plan provided for scheduled supervised visitation for both parents.

{¶ 8} Mother and R.K. consented to a finding of dependency on October 6, 2015. Temporary custody was awarded to LCCS on November 13, 2015. On November 16, 2015, the child was removed from her first foster family and placed with a second foster family.

3.

## C. LCCS moves for permanent custody.

{¶ 9} On May 27, 2016, LCCS moved for permanent custody of the child. As to mother, it alleged that (1) mother had been linked with Unison for mental health services, but was discharged for failure to attend services; (2) she stopped visits with the child on February 3, 2016, and had only recently requested to resume visitation; and (3) she admitted to alcohol and marijuana use and failed to submit to drug screens.

{¶ 10} With respect to R.K., LCCS alleged that (1) R.K. was linked with mental health services at Unison, but his case was closed for failure to attend services; (2) he reengaged in mental health services in February of 2016, and was diagnosed with ADHD, cannabis abuse, and bipolar disorder; (3) R.K. was linked with a case manager, an individual therapist, and a psychiatrist, but failed to consistently attend required mental health and batterer's services; (4) R.K. refused to submit to urine screens until May 10, 2016, at which time he tested positive for marijuana; (5) R.K. was not referred for parenting services because he failed to make progress in other areas of his case plan; and (6) R.K. was incarcerated for violating probation following convictions for domestic violence and underage consumption.

{¶ 11} In its motion, LCCS contended that the child could not be placed with either parent within a reasonable time or should not be placed with her parents and that mother and R.K. continuously and repeatedly failed to remedy the conditions causing the child to be placed outside the home. It maintained that both mother and R.K. failed to complete or participate in case plan services, that their mental health and substance abuse

4.

issues are so severe as to make them unable to parent the child within one year, and that they demonstrated a lack of commitment to their child by failing to participate in services or visit the child. LCCS further contended that the child has special needs that were not being addressed by her parents. It insisted that the child is in need of legally secure placement which cannot be achieved without an award of custody to LCCS, and that it is in the child's best interest to seek a permanent plan for adoptive placement.

## D. The case proceeds to trial.

{¶ 12} LCCS's motion for permanent custody proceeded to trial on November 4, 2016. The child's foster mother, Je.W. ("the foster mother") testified, as did R.K., R.K.'s grandmother, the LCCS caseworker, and the GAL. Mother did not appear at trial. Because mother is not a party to this appeal, we focus primarily on the testimony impacting R.K.

## 1. The foster mother

{¶ 13} The child's foster mother testified that she began fostering the child in November of 2015. The child had been removed from her first foster family because she exhibited aggression toward other children in the home. There are no other children in the current foster parents' home.

{¶ 14} The foster mother provided details about a number of the child's conditions requiring attention from health care professionals, including sleep disturbances, aggressiveness, tibial torsion, cognitive delays, gross and fine motor skill deficits, and

5.

sensory concerns. She explained how these conditions manifest themselves, and she described the treatment the child receives for these conditions.

{¶ 15} The child treats with Harbor Behavioral Health to address sleep disturbances and aggression. The foster mother said that the child wakes up screaming several times a night and becomes aggressive when attempts are made to comfort her. She described the time-consuming process of getting the child to sleep and putting her back to sleep after nightmares. The child also experiences "rages" when attempts are made to restrain her. During those "rages," she punches walls, kicks, hits, bites, throws objects, and is aggressive toward the family pets. The child has been diagnosed with post-traumatic stress disorder, and is receiving weekly trauma therapy aimed at helping her recognize and verbalize her feelings instead of acting out when she is upset. The child's foster parents engage in that therapy with her and they learn methods for working with her at home.

{¶ 16} The child receives visits from Help Me Grow to address cognitive delays. Professionals from Help Me Grow see the child both at school and at home and they provide tools to the foster parents that help them teach the child impulse control. The child is enrolled in early Head Start and will have an IEP once she starts school. The foster mother said that the child does not interact well with other children.

{¶ 17} An orthopedic specialist diagnosed the child with tibial torsion, a deformation of her legs. She receives biweekly physical therapy ("PT") for this. It is hoped that this condition can be corrected without surgery. She engages in weekly

6.

occupational therapy ("OT") for sensory concerns because she has issues with being touched. This manifests itself during diaper changes, bath time, and any time she needs to be handled. Noise and crowds disturb the child, and eating is an issue. And the child has delays in gross motor function and has very poor fine motor skills. The foster parents work with the child at home to improve her motor skills.

{¶ 18} The foster mother estimated that she devotes 11 hours a day to caring for the child, and her spouse is involved in the child's care as well. She said that caring for the child demands complete attention and line-of-sight supervision 24 hours a day. She emphasized that there is "no room for error," and she maintained that all the services she described are essential to the child's health, safety, and progress.

{¶ 19} The foster mother was questioned about the parents' interaction with the child during visitation. With respect to R.K., she testified that when his visits started, the child would scream and hide behind her legs. The child has since formed an attachment with him. The foster mother characterized R.K.'s visits as not consistent because he failed to show for several scheduled visits. Initially, R.K.'s visits were supervised by a security guard. Since September of 2016, he has had semi-supervised visitation and has missed only one appointment.

### 2. The LCCS caseworker

{¶ 20} The child's LCCS caseworker testified that the child was with her first foster family from August 19, 2015, until November 16, 2015. She was placed with a second foster family because the first foster family felt they could not adequately manage

7.

the child's needs. The child engages in PT, OT, trauma services, and treatment with an orthopedist and neurologist. She continues to be monitored by a neurologist because of frequent falls and imbalance.

{¶ 21} R.K. turned 18 in July of 2015. His paternity was established in October of 2015. At that point, a case plan was established for R.K. He was to obtain mental health and substance abuse treatment, secure stable housing and income, and receive parenting instruction. Visitation was offered to R.K. before his paternity was established, but he declined it because he said that he was too angry. He began visiting the child later in September of 2015 with his mother and grandmother. He then asked for his own visits, which began in November of 2015. Between November 2, 2015, and May 9, 2016, he attended 19 out of 24 visits. He asked for assistance from a visitation coach in March or April of 2016. The caseworker acknowledged that R.K. attended visits consistently despite not having a car. R.K. told the caseworker that the child sometimes stayed with him before LCCS became involved, but mother did not mention this to LCCS.

{¶ 22} R.K. was diagnosed with anger issues and ADHD. Unison prescribed medication for ADHD, and R.K. was referred to a psychiatrist in August of 2015. He failed to follow through and the caseworker presumes that his case was closed as a result. He was reassessed in early 2016, but again did not comply with treatment. He admitted to regular marijuana use. Initially, he refused drug screens. He eventually submitted to two drug screens, but tested positive for marijuana both times. R.K. could not be linked

8.

with substance abuse services because of inconsistent attendance. He also missed batterer's intervention appointments.

{¶ 23} In December of 2015, R.K. was charged with domestic violence in an incident involving the child's mother. R.K. and the mother insisted that this behavior was not typical and that it had resulted because someone put cocaine in R.K.'s drink. He was convicted and placed on probation.

{¶ 24} In May of 2016, it seemed that R.K. was turning a corner. He attended mental health services appointments more consistently. But then he was found to have violated probation and was incarcerated from May 11, 2016, until September 11, 2016, when he was released on house arrest. His incarceration interfered with his progress. As of October 17, 2016, R.K. still had not reengaged at Unison. Since being released from prison, he has attended four out of five visits with the child. He never completed services and never obtained domestic violence treatment.

{¶ 25} Housing and income were also concerns with R.K. He lived with his mother but did not want to stay there. After his house arrest was completed, he started living with a friend. He had part-time employment at Rally's and Iron Skillet but he was not earning enough money to support the child.

{¶ 26} A permanency plan conference took place in May of 2016. LCCS decided to file for permanent custody because neither parent had made sufficient progress on their case plan and the child needs permanency. The caseworker testified that she believes that it is in the child's best interest that permanent custody be awarded to LCCS because of

9.

the child's age and special needs. She expressed that the child needs a lifetime of care, energy, and stability, which she believes the foster parents can provide. Her view is that if R.K. cannot meet his own needs, he cannot meet the needs of his special needs child. She also stated that if R.K. was committed to his daughter, he would have changed his lifestyle.

{¶ 27} The caseworker described efforts to place the child with family. She testified that both a friend of the mother and the child's maternal uncle started the process of seeking custody, but both backed out. R.K.'s mother expressed interest, but she was ruled out because R.K. was residing in the home, the domestic violence incident involving the child's mother occurred in her home, and she had no verifiable income. The child's paternal great-grandmother is currently pursuing adoption. She completed the licensing curriculum and was assigned a home study worker.

### 3. R.K.'s grandmother

{¶ 28} R.K.'s grandmother testified that in September of 2016, she expressed to LCCS her desire to adopt the child. She completed 12 classes in October of 2016, but she said that she was told that her income was insufficient. She works at Holland Cleaning Services and the port authority. She said that she lives in a two-bedroom house and can provide food and stable shelter for the child. She insisted that if awarded custody, she will continue with the child's treatment and will get her to appointments. Although she works evenings from 3:30 p.m. to 9:00 p.m., she believes her employer will work with her to allow her to get the child to appointments.

**{¶ 29}** R.K.'s grandmother testified that mother would often drop the child off at R.K.'s home for days or weeks at a time and she observed R.K. interact with his daughter. She also attended some of R.K.'s scheduled visits with the child. She said that R.K. and the child interact well; he reads to her, plays with her, and talks with her. She has never seen R.K. get angry with the child when she cries. She said that she and R.K.'s mother will assist with the child if R.K. is awarded custody. She also said that R.K. will not be alone because he lives with his father who has a vehicle and can help out. Either she or R.K.'s father could help get the child to appointments. She said that R.K. is able to find jobs when he needs money, and she thinks he could provide the income necessary to care for the child.

### 4. R.K.

**{¶ 30}** R.K. turned 19 in July of 2016. He testified that he quit school when he was in the tenth grade. He has been living with his father for the past month. He lived with his mother in the past. He said that his mother or father will have him if he needs a home. Right now, just he and his father live together, and there is enough food and space for the child to live with them. He also said that he will contribute as much as possible toward the child's food, clothing, and shelter.

**{¶ 31}** R.K. is not currently employed. He had to quit his last job at Iron Skillet because of transportation problems. In the past he has worked at Rally's and has performed odd jobs. He said that he can find a job when he looks for one, so he believes

he can provide income for the child. He also believes he can provide insurance coverage. He expects that his father and grandmother will also help him with the child.

{¶ 32} Although the LCCS caseworker testified that she was not aware of this, R.K. testified that the child's mother would leave the child with him for various periods of time. He took care of his daughter during those periods, and he insisted that she was safe with him. R.K. testified that they interact well. She listens to him, they play, she laughs and jumps around, and she is happy. She does not have tantrums and she is not afraid of him.

{¶ 33} R.K. was incarcerated from May 11, 2016, to September 9, 2016. He had never been in jail that long before. He was disappointed that he missed visits with the child during that time. He said that while he was incarcerated, he reflected on how his actions affect his family, and his outlook has changed. R.K. admitted that he drank alcohol to celebrate his release from jail despite not being legally permitted to drink, but he insisted that it is not a habit. He acknowledged the domestic violence incident involving the mother, but he maintained that it happened because someone spiked his drink. He said that he has never smoked marijuana around the child.

{¶ 34} R.K. admitted that he has anger issues—he gets mad and frustrated easily—but expressed that he wants to go back on his medication. He talked to his Unison case manager last week and is waiting for an appointment. He said that he had been "playing phone tag" with Unison.

12.

{¶ 35} As to the child's special needs, R.K. admitted that he does not really know the specifics of those needs. He understands that the child has cognitive delays, but he does not know what that means. He also knows that she has issues with her legs. He is aware that she has a lot of appointments, but he has never been to a doctor appointment with her. R.K. conceded that he has never asked his daughter's foster parents about her treatment or medical care. He said that he gets information in the mail about her appointments, medications, and diagnoses, but he cannot remember the details. He insisted that his father and grandmother have cars, and his grandmother has a license, so they can help with getting the child to her appointments.

{¶ 36} R.K. admitted that even though he knew being employed was an important component of his case plan, he could not maintain his employment with Iron Skillet because he could not transport himself to work. He had been relying on a cousin who did not follow through. He also admitted that he is not currently in counseling or substance abuse treatment, and he has not attempted to reengage in substance abuse treatment even though he knew his trial date was coming up. He agreed that he has not complied with the services required of him, but he maintained that he will do whatever it takes to get custody of his daughter.

### 5. The GAL

{¶ 37} The child's GAL is a court-appointed special advocate and was appointed on August 24, 2015. She conducted an independent investigation in this case and authored a report dated October 18, 2016, explaining her recommendation. She

13.

recommends that LCCS be awarded permanent custody of the child for purposes of adoption. She observed that the child has bonded with her foster parents and is loving towards them. She said that she is amazed by the changes in the child since being placed with her foster family. The GAL credits both the treatment received from health care professionals and the attention from her foster parents for the child's improvement. It is apparent to her that the foster mother cares deeply for the child. The foster parents have worked with the child and there are no other children in the home.

{¶ 38} The GAL believes that permanent custody with the agency is in the child's best interest because mother cannot care for her and R.K. has not made significant progress in completing his case plan. She maintained that R.K. does not understand the scope of the care that his daughter requires. She characterized R.K.'s visitation as sporadic. While she has heard that he attended 19 out of 24 scheduled visits, she has never observed his visits with the child because he did not show for the visits she attempted to observe. She agreed that since he was released from jail, R.K.'s visits have been consistent.

{¶ 39} Despite her attempts, the GAL has never been able to reach R.K. She said that she does not have a current phone number for him. She asked the case worker for his number, but admitted that she never asked R.K.'s attorney. She tried leaving messages with his mother, but she never heard back from R.K. The GAL could not say when she last tried to call him, but she had not tried to reach him since he got out of jail on September 9, 2016, which was approximately 60 days before trial. She emphasized,

14.

however, that her recommendation is not based on R.K.'s interaction with the child; rather, it is based on his lack of progress and the importance of this child having treatment. She feels that if R.K. cannot complete his own services, there is no way he can handle the many services the child needs.

{¶ 40} The GAL did not speak to Unison about R.K.'s ADHD diagnosis or interview his doctors, but she reviewed reports and has been present at case reviews. Because he only treated for approximately one month, she did not feel it was necessary to speak to any particular doctor.

### E. The court grants LCCS's motion.

{¶ 41} The trial court granted LCCS's motion for permanent custody. It found that under R.C. 2151.414(B)(1)(a), there was clear and convincing evidence presented that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, and under R.C. 2151.414(D), a grant of permanent custody to LCCS is in the child's best interest. In determining that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the court relied on R.C. 2151.414(E)(1), (4), and (16).

{¶ 42} As to (E)(1), the court found that the parents failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. Specifically, with respect to R.K., it found that he had been referred for mental health and substance abuse treatment and batterers' intervention therapy, but he repeatedly missed appointments and did not engage in services until May of 2016.

15.

Although he was compliant for about one month, he was incarcerated and no further progress was made because he failed to reengage in services following his release. The court also found that R.K.'s mental health, anger, and substance abuse issues remain untreated and he remains unstable with no income and no stable home.

{¶ 43} As to (E)(4), the court found that the parents demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so. It observed that the parents were offered case plan services to remedy conditions that made them unsafe as custodians of the child, but they repeatedly failed to engage in the services offered, thereby demonstrating their lack of commitment.

{¶ 44} And as to (E)(16), the court found that the child has special needs, and to meet those needs, she needs a strong commitment from a person with patience. The court concluded that the parents do not have the ability to meet those needs and will not obtain that ability within a reasonable time. Specifically, it recognized that R.K. had been unable to get himself to services, visitation, and employment. It was not persuaded that R.K.'s plan for getting the child to necessary appointments—i.e., reliance on his father and grandmother for transportation—was sustainable.

{¶ 45} The court found that under R.C. 2151.414(D)(1), permanent custody in favor of LCCS is in the best interest of the child because (1) the child and her current caregivers have a positive relationship and are bonded, the child has been in the caregivers' home since November of 2015, and it is a stable placement; (2) the GAL and

LCCS caseworker testified that the child's needs are being met by her caregivers and both opined that permanent custody is in the child's best interest; (3) the child needs permanent, secure custody that can only be achieved through an award of permanent custody; (4) the parents cannot meet the child's needs because they have been unable to meet their own needs, they have not remedied the issues that were of concern at the time of the child's removal from their care, and the child has special needs that require attention, persistence, and patience that the parents have not demonstrated in the previous year; and (5) it is in the best interest of the child to seek a permanent plan for adoptive placement and planning.

{¶ 46} Finally, the trial court found that LCCS made reasonable efforts to avoid continued removal of the child from the home and to implement and finalize a permanent plan by providing numerous case plan services to the family. Only when those efforts failed did it seek permanent custody.

{¶ 47} The court ordered that permanent custody be awarded to LCCS for adoptive placement and planning and that parental rights be terminated. R.K. appealed the trial court's judgment and assigns the following error for our review:

> The Trial Court's finding that the children [sic] could not be returned to Appellant within a reasonable time was not supported by clear and convincing evidence.

## II. Law and Analysis

{¶ 48} The single error assigned by R.K. raises two issues: (1) whether the trial court incorrectly concluded that he demonstrated a lack of commitment to the child and that the child cannot be returned to him within a reasonable time; and (2) whether the GAL's testimony and report should have been excluded because the GAL failed to comply with Sup.R. 48. We will address these issues out of order.

### {¶ 49} The GAL's Testimony and Recommendation

{¶ 50} We generally review a trial court's decision to admit a GAL's testimony and recommendation for an abuse of discretion. *Miller v. Miller*, 4th Dist. Athens No. 14CA6, 2014-Ohio-5127, ¶ 15. Here, however, R.K. did not raise this error in the trial court. As such, we review for plain error only. Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.,* citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. "Reversal is warranted only if the outcome of the trial clearly would have been different absent the error." *Id.,* citing *Long* at paragraph two of the syllabus.

{¶ 51} Sup.R. 48 sets forth duties that a GAL is expected to undertake before making a recommendation as to the child's best interest. Section (D)(13) of that rule provides:

18.

A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:

(a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;

(b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

{¶ 52} R.K. contends that the GAL did not perform these duties because she did not talk to R.K., did not observe R.K. interact with the child, and did not gather sufficient information. He claims that the GAL's testimony should have been stricken and the report containing her recommendation should have been excluded from evidence.

{¶ 53} LCCS counters that the GAL performed all duties that were practicable for her to perform, and the items that were not practicable for her to perform would not have changed her recommendation. LCCS points to the GAL's testimony where she indicated that she (1) visited with the child and the caregivers in the caregivers' home; (2) attempted to observe the child with R.K. but was unable to do so because he failed to attend

20.

visitation; (3) contacted R.K.'s mother in an attempt to get a hold of R.K., but R.K. never responded; and (4) collected background information from the caseworker and court filings. LCCS points out that over the 14 months that the child was in its custody, R.K. visited only 19 times. It argues that the infrequency of his visits made it impracticable for the GAL to observe his interaction with the child.

{¶ 54} LCCS also insists that Sup.R. 48 is a general guideline that does not create a substantive right. It does not have the force of statute and its violation is not grounds for reversal.

{¶ 55} As LCCS argues, this court has specifically recognized that "Sup.R. 48 creates no substantive rights and does not carry the weight of the rule of law." *In re E.S.*, 6th Dist. Ottawa Nos. OT-14-008, OT-14-009, OT-14-011, OT-14-012, 2014-Ohio-3067, ¶ 61. The failure to comply with Sup.R. 48 does not generally require reversal unless the GAL's conduct fell so far below minimum standards as to render her testimony not credible or competent. *See Nolan v. Nolan,* 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, ¶ 26.

{¶ 56} Here, we have reviewed the record in its entirety, and we agree with LCCS that reversal is not required under the circumstances of this case. The GAL testified that she tried to observe R.K.'s interaction with the child by attending R.K.'s scheduled visitation, but the times that she tried to do this, R.K. failed to appear. She testified that she also made attempts to contact him by phone, but was never able to reach him. And while she did not speak with any of R.K.'s doctors or counselors, she indicated that it was

21.

not necessary to do so because she reviewed his records and his mental health treatment was very brief. We observe that R.K.'s counsel thoroughly cross-examined the GAL about perceived deficiencies in her investigation, and the court surely considered this in determining what weight to assign to the GAL's recommendation.

{¶ 57} In addition to this, the GAL specifically testified that her recommendation that LCCS be granted custody was not based on the quality of R.K.'s interaction with his daughter—in fact, the testimony at trial suggested that the interaction was appropriate and that the pair had formed a bond. The GAL's recommendation was based on R.K.'s failure to make progress in his case plan and her opinion that R.K. does not understand the full scope of the child's needs. She believes that if R.K. could not obtain services for himself, it was very unlikely that he would be able to follow through with the many services required to treat his special needs child.

{¶ 58} We find no plain error—and no abuse of discretion—in the trial court's admission of the GAL's testimony and recommendation.

## B. The court's findings under R.C. 2151.414(E)

{¶ 59} The trial court found that under R.C. 2151.414(B)(1)(a), the child has not been abandoned or orphaned, has not been in the custody of a public children's services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. On a motion for permanent custody, where a court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting

22.

permanent custody to the agency is in the child's best interest using the factors set forth in R.C. 2151.414(D) *and* whether any of the factors enumerated in R.C. 2151.414(E) are present which would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re I.D.*, 6th Dist. Lucas No. L-13-1162, 2014-Ohio-238, ¶ 26. Here, the trial court found that R.C. 2151.414(E)(1), (4), and (16) were all applicable as to R.K.

{¶ 60} "In a proceeding for the termination of parental rights, the trial court's findings must be supported by clear and convincing evidence." *In re P.W.*, 6th Dist. Lucas No. L-12-1060, 2012-Ohio-3556, ¶ 19. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *In re Tashayla S.,* 6th Dist. Lucas No. L-03-1253, 2004-Ohio-896, ¶ 14; *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter. *In re Stacey S.,* 136 Ohio App.3d 503, 520, 737 N.E.2d 92 (6th Dist.1999).

{¶ 61} We will not reverse a trial court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re P.W.* at ¶ 20. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that

23.

the decision must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Having said this, the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony. *In re P.W.* at ¶ 20. Its discretion in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" (Internal citations omitted.) *In re C.P.,* 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 10.

{¶ 62} Under R.C. 2151.414(E), "[i]f the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and

rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(16) Any other factor the court considers relevant.

{¶ 63} R.K. argues that the trial court incorrectly concluded that he demonstrated a lack of commitment and that the child cannot be returned to him within a reasonable time. He insists that the trial court had authority to extend temporary custody to provide him with additional time to meet the case plan. R.K. rationalizes his delay in seeking services, arguing that he was young and "needed some time to realize what was going on." He maintains that he was "making the right calls to get back into Unison," and that if given additional time, he could have successfully completed his case plan services.

{¶ 64} As to R.C. 2151.414(E)(1), LCCS counters that the evidence established that R.K. had not stabilized his life, was not in a position to provide care for the child, and had not addressed his mental health and substance abuse issues. He had only

recently been released from incarceration and house arrest and had not engaged in required services.

{¶ 65} As to R.C. 2151.414(E)(16), LCCS emphasizes that the child has special needs and she requires many appointments and home therapies to address her behavioral, sensory, and developmental delays and physical anomalies. It points out that R.K. demonstrated a poor understanding of her conditions, and he conceded that transportation had been a barrier to his own treatment, employment, and visitation. LCCS claims that while R.K. testified about assistance he expected from his family, this assistance was not provided to R.K. when he needed it for himself. Moreover, while his grandmother and father have offered help, his grandmother has two jobs and his father does not have a driver's license.

{¶ 66} LCCS did not specifically address R.C. 2151.414(E)(4).

{¶ 67} Only one R.C. 2151.414(E) factor must be present to support a juvenile court's conclusion that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. The juvenile court here found that three factors apply, and we agree with its conclusion.

{¶ 68} First, as to both (E)(1) and (4), R.K. readily admitted that he never completed the services required of him under the case plan. He delayed in seeking services to begin with, then his incarceration further impeded his progress. Yet despite knowing that the motion for permanent custody was pending and that trial was approaching, R.K. did not seek to reengage with Unison immediately upon his release

26.

from jail; he instead waited until just before trial. Moreover, while R.K. claims that he can find a job when he needs one, he appeared for trial without a job and without any evidence that he had sought employment. He also failed the only two drug tests to which he submitted and continued to consume alcohol despite being underage.

{¶ 69} As to (E)(16), the evidence was clear that the child has special needs requiring many appointments and home therapies. Transportation was a barrier to R.K.'s own treatment, employment, and visitation. While his family is now expressing a willingness to help with transporting the child to appointments, they failed to do this for R.K. when he himself needed their assistance. In addition to this, R.K. demonstrated a very poor understanding of his daughter's special needs despite having been provided with this information during the pendency of the case. Not only does the child need help from outside providers, she needs someone who can work closely with her at home. While R.K. may have good intentions of getting the child the assistance she needs, he appeared ill-equipped to do so.

{¶ 70} Accordingly, we find that there was clear and convincing evidence in support of the trial court's findings under R.C. 2151.414(E)(1), (4), and (16). Its determination that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent is not against the manifest weight of the evidence.

{¶ 71} We find R.K.'s single assignment of error not well-taken.

27.

### III.  Conclusion

**{¶ 72}** We find R.K.'s sole assignment of error not well-taken.  We affirm the November 23, 2016 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating R.K.'s parental rights and granting permanent custody to LCCS. The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.                               _____
                                                                    JUDGE
Thomas J. Osowik, J.

                                               _____
Christine E. Mayle, J.                                           JUDGE
CONCUR.

                                               _____
                                                                    JUDGE